UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

RENE LISOJO,                                              :

                Petitioner,                    :

          -against-                            :                    09 Civ. 7928 (CM) (AJP)

DAVID ROCK, Superintendent,                              :      **REPORT AND RECOMMENDATION**
Great Meadow Correctional Facility,
                                :

                Respondent.                   :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**ANDREW J. PECK, United States Magistrate Judge:**

**To the Honorable Colleen McMahon, United States District Judge:**

               Pro se petitioner Rene Lisojo seeks a writ of habeas corpus from his February 28,

2003 conviction of second degree murder (depraved indifference) and sentence of twenty-five years

to life imprisonment.  (Dkt. No. 2: Petition ["Pet."] ¶¶ 1-5; Dkt. No. 14: Lisojo Reply Br. at 2, 4.)

Lisojo's habeas corpus petition asserts that:  (1) "The evidence [was] legally insufficient to support

[his] conviction of second-degree murder under a theory of depraved indifference . . . ." (Pet.

¶ 13(1)); (2) "The trial court's refusal to instruct the jury on second-degree reckless manslaughter

deprived [him] of due process . . . by removing from the jury's consideration a complete defense

dispositive of guilt or innocence" (Pet. ¶ 13(2)); and (3) he "received ineffective assistance [of] trial

counsel . . . ." (Pet. ¶ 13(3)).

               For the reasons set forth below, Lisojo's petition should be <u>DENIED</u>.

H:\OPIN\LISOJO

## FACTS

On February 9, 2001, Rene Lisojo was indicted for the murder of Giselle Figueroa. (Dkt. No. 5: Ex. 2[1/]: State 1st Dep't Br. at 3; Ex. 1: Lisojo 1st Dep't Br. at 2; Dkt. No. 14: Lisojo Reply Br. at 4.)  Lisojo was charged with second degree murder (intentional), second degree murder (depraved indifference), and fourth degree criminal possession of a weapon.  (Dkt. No. 2: Pet. ¶ 5; Lisojo Reply Br. at 8; Lisojo 1st Dep't Br. at 2, 4-5; State 1st Dep't Br. at 3.)  On January 13, 2003, Lisojo proceeded to trial before Justice Joseph Fisch and a jury in Supreme Court, Bronx County. (Dkt. Nos. 8-10: Trial Transcript ["Tr."] 1.)

**The Prosecution Case**

On January 8, 2001, at approximately 6:00 p.m., twenty-two year old Giselle Figueroa went to the home of her friend Anna Ortiz.  (Ortiz: Tr. 28-30.)  Figueroa had just finished work for the day and wanted to celebrate an upcoming vacation, so she and Ortiz spent the evening "socializing, talking and laughing" at a bar.  (Ortiz: Tr. 30-32, 41.)  At approximately 2:45 a.m., Ortiz called a cab to take them home.  (Ortiz: Tr. 32.)  The cab first went to 40 Richman Plaza, also known as River Park Towers, where Figueroa lived.  (Ortiz: Tr. 28-29, 33.)  Ortiz watched from the cab as Figueroa safely entered her apartment building.  (Ortiz: Tr. 33, 43.)  Figueroa was wearing a red leather coat, a black sweater, a white blouse, a black scarf, blue jeans, and red boots.  (Ortiz: Tr. 33-39, 45-46.)

---

[1/]      References to exhibits, unless otherwise indicated, are to the affidavit of A.D.A. Allen H. Saperstein (Dkt. No. 5).

Three days later, on January 12, 2001 at approximate 12:30 a.m., Police Officer Joseph Pascucci received a "radio run for a missing person" at 40 Richman Plaza, apartment 34-F. (Pascucci: Tr. 72.)  In the lobby, Officer Pascucci met Figueroa's mother, who had not heard from her daughter for some time.  (Pascucci: Tr. 72.)  Officer Pascucci proceeded to the thirty-fourth floor where he "detected a foul odor" coming from apartment 34-F.  (Pascucci: Tr. 72.)  Officer Pascucci "notified [his] sergeant" and the Emergency Services Unit.  (Pascucci: Tr. 72.)

At approximately 12:40 a.m., ESU Detectives Steven Malagraph and Glenn O'Donnel arrived on the scene.  (Malagraph: Tr. 51-52.)  Outside apartment 34-F, Det. Malagraph smelled "a heavy odor of decaying body."  (Malagraph: Tr. 53.)  Det. Malagraph removed the lock from the apartment door, entered and observed Figueroa "laying face down in a pool of dried blood." (Malagraph: Tr. 53, 54, 58, 65.)  Figueroa had  a "white shirt on with a black zipper up sweater" that was pulled down around her arms.  (Malagraph: Tr. 54, 68-69.)  It was "as though [her arms] were tied, but they were not tied."  (Malagraph: Tr. 65, 67.)   She was "wearing a scarf," but "had no clothing from the waist down except for a bed sheet that was tied around her legs."  (Malagraph: Tr. 54, 65, 67.)  Figueroa had suffered "multiple knife wounds"and Det. Malagraph observed a "broken knife still in [her] body."  (Malagraph: Tr. 54, 65.)  Det. Malagraph noted that "the apartment was very disheveled.  It appeared that there had been an altercation.  There was a bed that one side of it had been knocked down.  Ashtrays had been overturned and there were cigarette butts and ashes all over the place."  (Malagraph: Tr. 55, 63-64.)   Near the entrance of the apartment, Det. Malagraph

4

noticed the "tip of a knife," "about two to three inches long," and a "small hoop earing." (Malagraph:

Tr. 53, 60, 61, 68.)

At approximately 2:20 a.m., Detectives Frank Tegano and Thomas White of the

Crime Scene Unit responded to the apartment. (Tegano: Tr. 109.) Det. Tegano described the scene:

> [Figueroa] was lying face down on the floor.  She had a bed sheet tied around one of
> her legs.  Her arms had been pulled behind her back.  The shirt was partially pulled
> down in the back.  There was a knife handle sticking out of her clothing on her back.
> She had a visible stab wound to the center of her back approximately just below her
> neck.  She was not wearing any pants or any shoes.  She had socks on at that
> time. . . . [T]here was a pool of blood around her that had been dried.

(Tegano: Tr. 111-12.) Det. Tegano examined the broken knife blade found near the doorway; it was

"approximately four inches in length," "serrated on one side" and "very sharp." (Tegano: Tr. 132.)

Det. Tegano also examined the knife handle found in Figueroa's body; it was made of black plastic

and had a small section of blade "sticking out of [it]." (Tegano: Tr. 132-33.)  The broken knife

appeared to belong to a set of knives found in a butcher block in the kitchen.  (Tegano: Tr. 133.)

In addition to the broken knife, Detectives Tegano and White recovered twenty-three

latent fingerprints from surfaces within the apartment (including one from the blade fragment

attached to the knife handle), a blood sample taken from the interior doorknob of the entrance door,

the entire doorknob of the entrance door, a red leather jacket with blood spots on it, a black leather

jacket without blood on it, numerous Marlboro and Newport brand cigarette butts, a pair of gold

hoop earrings, and a broken fingernail. (Tegano: Tr. 134-35.)[2]

---

[2]    Detective Daniel Perruzza of the Latent Print Unit examined the twenty-three latent finger
(continued...)

At approximately 2:45 a.m., Penelope McNicholas, a Medical Legal Examiner from the New York City Medical Examiner's Office, arrived at the scene. (McNicholas: Tr. 79-80, 82-83.) McNicholas observed Figueroa's body on the floor wearing a white "croppy shirt" and a black sweater. (McNicholas: Tr. 84, 85.) Figueroa's arms were "tucked up underneath her sweater," almost like they had been tied. (McNicholas: Tr. 84.) The broken knife was sticking out of her back. (McNicholas: Tr. 84, 85.) Figueroa had a "black knit scarf tied tightly around her neck" and was naked from the waist down except for two socks. (McNicholas: Tr. 85) McNicholas observed multiple stab wounds on Figueroa's chest, neck and back. (McNicholas: Tr. 86-88.) One stab wound was located "right below the knot of the scarf on the right side of her chest." (McNicholas: Tr. 90; Tegano: Tr. 119.) McNicholas also observed a fluid coming from Figueroa's vagina. (McNicholas: Tr. 87.) Believing the fluid to be semen, McNicholas took samples. (McNicholas: Tr. 87.) Figueroa's nails were broken and she had a black eye. (McNicholas: Tr. 87; Tegano: Tr. 119.) McNicholas placed brown paper bags around Figueroa's hands "to preserve any evidence that may be under her nail beds," and transferred the body to the morgue. (McNicholas: Tr. 87-88.) Based

---

[2]     (...continued)
prints recovered from the crime scene. (Perruzza: Tr. 445-46.) Of the twenty-three finger prints, only eight were deemed to be "of value," meaning they were clear enough to make a comparison. (Perruzza: Tr. 446, 451.) The print taken from the blade fragment attached to the knife handle was "smudged" and could not be identified. (Perruzza: Tr. 449-50.) One print taken from the bathroom faucet was identifiable as a print from Figueroa's left pointer finger. (Perruzza: Tr. 450, 456.) None of the other prints examined were identifiable. (Perruzza: Tr. 451, 457-58.)

upon the level of decomposition of Figueroa's body , McNicholas estimated that she had been dead for over twenty-four hours.  (McNicholas: Tr. 92.)

Detective Michael Elliott of the 46th Precinct Detective Squad was assigned to investigate Figueroa's murder.  (Elliott: Tr. 147, 209.)  On January 13, 2001, Det. Elliott distributed approximately 200 flyers throughout River Park Towers seeking information about Figueroa's death.  (Elliott: Tr. 151, 172, 215-16, 226, 284.)  The flyers contained Det. Elliott's contact information, Figueroa's photograph and offered "a thousand dollar reward for any information . . . that would help . . . with the investigation."  (Elliott: Tr. 172.)

On January 14, 2001, at approximately 9:00 a.m., Det. Elliott received a telephone call from Rene Lisojo, a security guard at River Park Towers, who claimed to have information concerning "the murder of Giselle Figueroa that would knock [Elliott's] socks off."  (Elliott: Tr. 151-52, 215-16, 218.)  Lisojo agreed to meet Det. Elliott at the police station later that afternoon.  (Elliott: Tr. 152, 216.)

At approximately 1:30 p.m., Lisojo arrived at the 46th Precinct.  (Elliott: Tr. 152-53, 216.)  Lisojo told Det. Elliott that he worked at River Park Towers from 4:00 p.m. on January 8, 2001 to 8:00 a.m. on January 9, 2001.  (Elliott: Tr. 153, 156, 218.)  Lisojo recalled seeing Figueroa, whom he called "Pebbles," come home at approximately 2:30 a.m. on the morning of January 9.  (Elliott: Tr. 153, 156.)   Because there had been a violent disturbance in the building's lobby that night, Lisojo escorted Figueroa up to her apartment, whereupon she offered him a tuna fish sandwich and a cola.  (Elliott: Tr. 153-54, 157.)  Lisojo ate the sandwich, and after receiving several radio

calls from his supervisor, returned downstairs.  (Elliott: Tr. 154, 157.)  After Lisojo spoke, Det. Elliott wrote out his statement.  (Elliott: Tr. 154-56, 221.)  Lisojo reviewed and signed the written statement without correction.  (Elliott: Tr. 156, 157, 225.)  Lisojo told Det. Elliott "to give him a call" if he could be of any further help, and left the precinct.  (Elliott: Tr. 158, 225.)

On January 15, 2001, Det. Elliott phoned Lisojo's home asking whether Lisojo "could come [back] into the precinct" that afternoon.  (Elliott: Tr. 158-59, 226-27.)  At approximately 5:30 p.m., Det. Elliott  interviewed Lisojo a second time.   (Elliott: Tr. 159-60, 227-29.)  Lisojo expanded on what he had said the day before:  he had known Figueroa for "about two or three months," he frequently visited her apartment while on duty and, on the night of her murder, he entered her apartment and sat on her bed.  (Elliott: Tr. 160, 163-65, 233.)  After having a sandwich and soda in Figueroa's apartment, Lisojo reported to his supervisor and continued his duties.  (Elliott: Tr. 163-65.)  As before, Det. Elliott wrote out what Lisojo told him and, after Lisojo reviewed it for accuracy, Lisojo signed it.  (Elliott: Tr. 161-62,165.)

Det. Elliott drove to River Park Towers to confirm Lisojo's statement that he had worked on January 8 and 9.  (Elliott: Tr. 167-68, 232, 235.)  Lisojo agreed to remain at the precinct until Det. Elliott returned.  (Elliott: Tr.166-67, 235.) Det. Elliott spoke with security personnel at River Park Towers and verified that Lisojo had worked on January 8 and 9, 2001.  (Elliott: Tr. 167-68, 236, 238-39.)

Between 10:15 and 10:30 p.m., Det. Elliott returned to the 46th Precinct.  (Elliott: Tr. 168, 237.)  After showing Lisojo to the restroom and providing him with a soda, Det. Elliott,

together with Detectives Brown and Berberich, conducted a third interview.  (Elliott: Tr. 169-70, 237-40).  This time, Lisojo told the detectives that he actually returned to "the thirty fourth floor to check on" Figueroa about one and one-half hours after his first visit.  (Elliott: Tr. 171, 174, 177, 240.)  Lisojo noticed that Figueroa's door was open, he went in, and saw Figueroa's "feet and blood." (Elliott: Tr. 171, 177, 240.)  Lisojo closed the door, went downstairs and reported what he had seen to his supervisor.  (Elliott: Tr. 174, 177, 243.)  Again, Lisojo's statement was reduced to writing and signed by him.  (Elliott: Tr. 175-77, 244.)

At 11:00 p.m., Lisojo expanded on his previous statement.  (Elliott: Tr. 178-79, 246.) This time he told the detectives that, when he returned to Figueroa's apartment, the sight of Figueroa's "feet and blood" made him nervous and he flicked his cigarette into the apartment. (Elliot: Tr. 179, 182, 247.)  Lisojo called his supervisor who came to Figueroa's apartment, looked in, and said "let's go."  (Elliott: Tr. 179, 182, 247.)  Lisojo "did not call the police or ambulance anytime that night."  (Elliott: Tr. 179, 182, 247.)  Again, Det. Elliott wrote out what Lisojo told him and had Lisojo review and sign it.  (Elliott: Tr. 179-81.)

On January 16, 2001, at approximately 12:30 a.m., Lisojo stated that on the morning of January 9, 2001, he and Figueroa had gotten into a physical altercation and a knife was involved. (Elliott: Tr. 183-84, 255-56.)  Det. Elliott interrupted Lisojo and Det. Berberich read him Miranda warnings.  (Elliott: Tr. 184-87, 256.)  Lisojo acknowledged that he understood his rights and that he wanted to continue talking with the detectives.  (Elliot: Tr. 185-87.)  Lisojo gave the following written statement:

"I made this statement after I was advised of my Miranda Warnings.

"I ran into [Figueroa] in the lobby of Richman Plaza.  I said to her when I seen her, 'Yo, I will escort you upstairs.'  I told my boss, . . . 'Yo, give me a few.  I'll be right back.'

"I went to her apartment and had something to eat.  While I was eating, they started to call me on the radio.  This was about 3:00 A.M.  When I was leaving, [Figueroa] kissed me good-bye on the neck and stated 'Make sure you come back.  I'll be waiting.'  I went downstairs to do reliefs.

"About a half hour later I went back upstairs to her apartment.  She opened the door for me, and I went inside.  She was wearing a shirt and a towel around her waist.  I sat down on the couch.  She stood in front of me and dropped the towel.  Underneath she had on a white G-string.  She then grabbed my neck, put her leg on the sofa and put her [vagina] in my face.  I pulled back.  When I did, she smacked me in my face and said, 'Come on.  Come on.  Beat me.'  We fell to the floor then.  While on the floor she calmed down and said, 'I'll be gentle.'  I then took off my coat and thought we can get down.

"She then started laughing and pulled out a knife.  She tried to cut the buttons off my uniform.  She kept saying, 'I'll be gentle.  Don't let this scare you.'  When she came at me with the knife, I took the knife from her and swung and jabbed at her several times.

"When I first struck her, she said, 'You fuck.'  She still kept coming at me, so I kept sticking her.  She fell to the ground and started moaning.  I saw some blood coming from her neck, so I grabbed – so I got scared, I wrapped the scarf around her neck and put the sweater on her back.  I covered her with a towel and a sheet and then left."

(Elliott: Tr. 191-93.)  After Lisojo reviewed and signed the statement, Det. Elliott notified the

District Attorney's Office.  (Elliott: Tr. 193, 265-66.)

At approximately 2:30 a.m., ADA Lowry-Knapp arrived at the 46th Precinct and

Lisojo gave a videotaped statement.  (Dkt. No. 13: Lisojo Supp. Reply Br. Ex. 1: 1/16/01 Video

Transcript ["V."]; Elliott: Tr. 194-95.)  The videotape was played for the jury at trial.  (Tr. 196.)

ADA Lowry-Knapp began by again reading Lisojo his <u>Miranda</u> rights. (V. 19-20.) Lisojo stated that on January 9, 2001, following an altercation in the lobby, he escorted Figueroa upstairs to her apartment. (V. 23-24.) Figueroa "didn't appear drunk" but was "giggly." (V. 52.) When they arrived on the thirty-fourth floor, Lisojo asked Figueroa for something to eat and she offered him a tuna sandwich, which he ate while seated on Figueroa's bed. (V. 24-25.) Figueroa continued to giggle and flirt with Lisojo. (V. 25.) Lisojo received a radio call from his supervisor and had to leave to resume his duties. (V. 25.) Before leaving, however, Figueroa told him to "make sure [he] c[a]me back." (V. 25-26, 67.) Lisojo could tell that "she wanted it." (V. 52.)

Lisojo said that he returned to Figueroa's apartment later that morning, at around 4:00 a.m., for a "quick pick me up." (V. 26, 53, 66.) Figueroa greeted Lisojo at the door in a towel and a shirt. (V. 26, 67.) Lisojo entered the apartment, set his walkie-talkie on the table and sat on the sofa. (V. 26.) Figueroa approached him and took off the towel, revealing her G-string. (V. 27, 63, 68.) She put one foot up on the couch and grabbed Lisojo's neck. (V. 27, 68-69.) Lisojo told the ADA that his saliva would be found in Figueroa's vagina because he "touched her," but that his semen would not because they did not have intercourse. (V. 69.) Lisojo "pushed her off a little bit," and Figueroa "slapped" him. (V. 27.) Lisojo said "holy shit," and Figueroa jumped on him, straddling him with both knees on the couch. (V. 27-28, 72-73.) Lisojo tried to push her off, grabbing the waistband of her underpants, and they both tumbled to the floor. (V. 28-29, 73-74.) Lisojo told Figueroa that he was not "with that rough shit" and threatened to leave, but Figueroa convinced him to stay, explaining that she was just "bugging out." (V. 29, 69-70, 77.) The two sat

back up, with Figueroa on top of Lisojo, and she reached towards the radio and "whipped out a knife." (V. 29, 77.)  Figueroa explained that she wanted to "pull up the buttons" of his uniform, but Lisojo – realizing that Figueroa "wanted it rough" – tried to "break her off." (V. 29, 70-71, 78-79.)  A struggle ensued and when Lisojo felt "the stick" of the knife, they "rumbled." (V. 29.)  Lisojo grabbed Figueroa's wrist and "stuck her by mistake on the back." (V. 29-30, 70-71, 78-79.)  Figueroa cried out and, as Lisojo got up, started "coming at" him. (V. 30, 71, 81.)  Lisojo "tried to calm her down[,] [b]ut things got out of hand . . . ." (V. 30.)  Figueroa "started hitting" Lisojo and he "started swinging the knife," three times. (V. 30, 82.)  At some point in their struggling, Figueroa fell on the knife. (V. 89.)  Lisojo "started seeing blood" and "freaked out"; he had "never seen blood . . . like that." (V. 30, 63, 71, 83, 90.)  Seeing Figueroa on the floor with "the blood coming out," Lisojo reached for a scarf and tried to stop the bleeding. (V. 30-31, 43, 90.)  Figueroa "started moaning. . . . and then . . . everything just went still . . . ." (V. 31, 45-46, 90.)  Lisojo covered Figueroa's body, washed his hands, returned to the security office, covered himself and cried. (V. 31, 61-62.)  Because he "felt bad," he contacted the police, but thought he acted in self-defense. (V. 88-89.)

After giving the videotaped statement, Lisojo went to sleep for about three hours in the interview room. (Elliott: Tr. 197.)  When Lisojo awoke, Det. Elliott fed him and asked for permission to retrieve certain personal property from Lisojo's home. (Elliott: Tr. 197-201.)  After receiving Lisojo's permission, Det. Elliott went to Lisojo's home and recovered his work uniform. (Elliott: Tr. 204; Tierney: Tr. 356-57.)  DNA analysis confirmed that blood stains found on Lisojo's work shirt and jacket matched Figueroa's DNA profile. (Rosenberg: Tr. 396-401.)  Although testing

of vaginal swabs were negative for semen (Rosenberg: Tr. 414), analysis of a fluid found on Figueroa's thigh matched Lisojo's DNA profile.  (Rosenberg: Tr. 409-10.)

On January 12, 2001, Dr. Karen Turi of the Office of the Chief Medical Examiner performed an autopsy of Figueroa's body.  (Gill: Tr. 304.)  Figueroa was five feet four inches tall and weighed 100 pounds.  (Gill: Tr. 309.)  Dr. Turi noted that Figueroa's clothing was stained with blood, and found multiple holes in the scarf tied around her neck.  (Gill: Tr. 308.)  Blood found on the scarf was concentrated around those holes indicating that it had been around Figueroa's neck at the time of the stabbing rather than being placed there after the injuries were inflicted.  (Gill: Tr. 308, 350.) An external examination of Figueroa's body revealed multiple bruises to her arms and face, and knife wounds to her neck and torso.  (Gill: Tr. 309-11.)  Specifically, Figueroa suffered:  (1) a one and one-half to two inch stab wound to the "upper right chest by her neck" which entered into the chest cavity and "injured . . . the right subclavian artery" causing bleeding into the chest cavity; (2) a stab wound to "the back of her torso" of approximately one-half to one inch deep that "entered the muscles of the back, but . . . did not enter into the chest cavity"; (3) an incised wound to the back of her torso; (4) three stab wounds in close proximity "on the left front side of the neck" measuring one and one-half to two inches in depth, one of which "went through some of the ligaments that hold the . . . spinal column in place; cutting some of the bone of the spinal column and then [entering] the spinal canal"; (5) bruises to her forearms, elbows and wrists; (6) bruising around the left eye; and (7) broken fingernails on the fourth and fifth fingers of her left hand.  (Gill: Tr. 313-19.)

According to Dr. Gill of the Medical Examiner's Office, the injuries to Figueroa's forearms and fingernails were "consistent with a struggle." (Gill: Tr. 315, 350.)  From the closely spaced stab wounds on Figueroa's neck, Dr. Gill inferred that Figueroa was "likely incapacitated," because the tight spacing indicates that the victim "could not move when [she was] being stabbed in that location." (Gill: Tr. 320.)  Dr. Gill further inferred that a "good amount of force" was used to inflict those wounds as they had passed "through the scarf, the skin, the muscles, the ligaments and even cut some bone." (Gill: Tr. 322-23.)  The direction of the wounds were "from front to back, left to right" and were inconsistent with Lisojo's story of standing face to face with Figueroa and stabbing at her as she approached.  (Gill: Tr. 319, 322.)  Cause of death was determined to be "multiple stab wounds of neck and torso with multiple vascular injuries." (Gill: Tr. 311, 319, 343.) In other words, Figueroa bled to death.  (Gill: Tr. 319.)

At the end of the State's case, Lisojo moved for "a trial order of dismissal as the People have not made out a prima facie case." (Dudley: Tr. 465.)  Justice Fisch denied that motion. (Tr. 465.)

**The Defense Case:  Lisojo's Testimony**

In January 2001, Rene Lisojo was thirty-two years old, lived with his parents in Coney Island and worked for Baitul Nasr Security. (Lisojo: Tr. 473.)  Lisojo had been convicted of five felonies, including attempted grand larceny, possession of stolen property, attempted assault and robbery. (Lisojo: Tr. 579-85.)  Lisojo began working as a security guard at River Park Towers in

November 2000, and shortly thereafter, met and became friends with Figueroa, whom he called "Pebbles." (Lisojo: Tr. 475-77, 533.)

River Park Towers is made up of four adjacent buildings numbered ten, twenty, thirty and forty. (Lisojo: Tr. 475.) On January 8, 2001, Lisojo was assigned to a stationary security post in the basement parking garage from 4:00 p.m. to 12:00 a.m. (Lisojo Tr. 478.) Because there was a shortage of guards available, Lisojo was required to work a "roving," second shift from 12:00 a.m. to 8:00 a.m. on January 9, 2001. (Lisojo: Tr. 478-79.) As a "rover," Lisojo was required to relieve guards at stationary posts who needed meal or bathroom breaks, and to respond to emergencies as necessary. (Lisojo: Tr. 479.)

At approximately 2:30 a.m. on January 9, 2001, Lisojo got a report of a disturbance outside of buildings thirty and forty. (Lisojo: Tr. 480.) Lisojo ran to the scene and observed a man "swinging a golf club" at a group of people. (Lisojo: Tr. 480.) "[E]verybody started running inside building 40" and Lisojo called 911. (Lisojo: Tr. 480-81.) By the time the police arrived, the man with the golf club had disappeared, but there were still some "stragglers in the lobby" of building 40. (Lisojo: Tr. 481-82.) At about that time, Figueroa returned home and because of the people in the lobby, Lisojo offered to escort Figueroa to her apartment. (Lisojo: Tr. 482-83.) In the elevator, Lisojo and Figueroa began "laughing and giggling." (Lisojo: Tr. 483.) Lisojo asked Figueroa for something to eat and she invited him inside for a sandwich. (Lisojo: Tr. 483.) Inside the apartment, the two began to kiss. (Lisojo: Tr. 485-86.) Lisojo lifted Figueroa's shirt and kissed her stomach, then unbuttoned her pants and kissed her on the thigh. (Lisojo: Tr. 486.) At that moment, Lisojo

received a report from his supervisor concerning a disturbance at building twenty, so he went downstairs to meet his supervisor.  (Lisojo: Tr. 486-87.)

At approximately 4:00 a.m., Lisojo returned to building forty and relieved the guard at the security post in the lobby.  (Lisojo: Tr. 488.)  At approximately 4:30 a.m., the guard returned from his meal break and Lisojo went to building twenty to relieve the guard there, remaining at that post until 5:07 a.m.  (Lisojo: Tr. 489.)  Lisojo "conducted post checks of buildings ten, twenty, thirty, forty, basement, traffic," finished his shift at 8:00 a.m. and returned home to Brooklyn.  (Lisojo: Tr. 490.)

On Friday, January 12, 2001, Lisojo returned to River Park Towers and saw a flyer seeking information about Figueroa.  (Lisojo: Tr. 490, 534.)  On the morning of January 14, 2001, Lisojo called the 46th Precinct and arranged to meet with Detective Elliott.  (Lisojo: Tr. 490-91, 539-40.)  When Lisojo arrived, Det. Elliott took him into the interview room where Lisojo volunteered information about Figueroa and the River Park Towers complex.  (Lisojo: Tr. 493-94.)  Specifically, Lisojo told Det. Elliott that Figueroa had problems with her son's father, and that a "lot of times [Lisojo] had to respond with two guys to her door just to get the people out . . . ." (Lisojo: Tr. 495-96.)  Det. Elliott questioned Lisojo about his shifts on January 8th and 9th, and copied Lisojo's memo book which detailed Lisojo's activities.  (Lisojo: Tr. 496, 499.)  Lisojo stayed at the 46th Precinct for about two and one-half hours before going home.  (Lisojo: Tr. 497.)

On January 15, 2001, Lisojo received a message from Det. Elliott asking him to come back to the 46th Precinct.  (Lisojo: Tr. 497, 541-42, 564-65.)  Lisojo thought it likely that the police

had a suspect in custody and went directly to the precinct, where he encountered Detective Berberich, who was investigating a homicide that occurred on December 24, 2000. (Lisojo: Tr. 498, 542.) Det. Berberich had noticed an entry in Lisojo's memo book from December 24 in which Lisojo reported having heard six gunshots while working near 1491 Montgomery Avenue, the location of the murder. (Lisojo: Tr. 498.) Det. Berberich took Lisojo into the interview room and told him that although the police had already arrested one suspect in connection with the Christmas Eve shooting, they believed a second man was involved. (Lisojo: Tr. 499-500.) Det. Berberich wanted Lisojo to identify the second suspect but Lisojo insisted that he had not seen the shooting. (Lisojo: Tr. 499-500.)

After Det. Berberich questioned Lisojo for approximately thirty minutes, Det. Elliott arrived and asked Lisojo to go over the events of January 8 and 9, 2001. (Lisojo: Tr. 500-01.) Lisojo told Det. Elliott that Figueroa had come home between 2:40 a.m. and 3:00 a.m. and that he had escorted her up to her apartment. (Lisojo: Tr. 501.) Det. Elliott left the interview room and Det. Berberich came back in. (Lisojo: Tr. 501-02.) Det. Berberich showed Lisojo the police file of the man believed to have been involved in the Christmas Eve murder. (Lisojo: Tr. 502.) Det. Berberich wanted Lisojo to say that he had seen that man with the shooter, but Lisojo insisted that he would not "say something [he] didn't see." (Lisojo: Tr. 502.) Det. Berberich's partner threatened that the police could "charge [Lisojo] with accessory, and withholding information," but Lisojo insisted that he was "not gonna say something that [he] didn't see." (Lisojo: Tr. 503.)

Lisojo was left alone in the interview room for about ten minutes before Det. Elliott returned.  (Lisojo: Tr. 503-04.)   Det. Elliott told Lisojo that he was "the prime suspect for [the Figueroa] homicide."  (Lisojo: Tr. 504.)  Lisojo, shocked, said:  "what the hell you talking about, I came to you."  (Lisojo: Tr. 504.)  Det. Elliott confronted Lisojo with inconsistencies in his story but Lisojo insisted he had told the truth and believed Det. Elliott was "playing head games."  (Lisojo Tr. 504-06.)

Det. Elliott left the interview room and Det. Berberich returned.  (Lisojo: Tr. 506-07.) Det. Berberich told Lisojo that he was being charged with "accessory and withholding information" in connection with the Christmas Eve murder and that they had already begun the paperwork. (Lisojo: Tr. 506-07.)  Det. Berberich's partner told Lisojo:  "'you was there, you was there. . . . Come on, let it out.  Come on, just help us out and all this will go away.'"  (Lisojo: Tr. 507.)  Lisojo responded:  "'of course I was there but on the other block, . . . I'm not gonna lie about something I didn't see.'"  (Lisojo: Tr. 507.)

Det. Elliott returned and told Lisojo that the police had found his fingerprints and DNA in Figueroa's apartment, and had witnesses who saw him leaving her apartment.  (Lisojo: Tr. 507-08.)  Lisojo said his fingerprints and DNA were explained by his having been in the apartment, seated on the sofa.  (Lisojo: Tr. 507.)  Lisojo volunteered to take off all his clothes so that the police could inspect his body for scratches.  (Lisojo: Tr. 508.)   The detectives inspected Lisojo's body but could not find any scratches.  (Lisojo: Tr. 508-09.)  After being made to stand naked for over ten minutes, Lisojo commented that the police officers "must be liking what [they] see"; Det. Elliott

responded by slamming Lisojo on to the table and shouting: "'Oh you're a tough guy.'" (Lisojo: Tr. 509, 517.)

Det. Elliott told Lisojo that they had found his fingerprints on a knife, but Lisojo denied it. (Lisojo: Tr. 509.) Detective Brown told Lisojo: "'listen, we don't think you're a bad person. . . . what [kind of] person would cover her up[?]'" (Lisojo: Tr. 510.) Lisojo responded: "'What the hell are you talking about[?]'" and Det. Brown replied: "the person that loved her covered her up." (Lisojo: Tr. 510.) Det. Berberich suggested things would be "'much easier'" if Lisojo cooperated and that "'it look[ed] like a self-defense.'" (Lisojo: Tr. 510.) Lisojo challenged that if the police had anything on him they would arrest him, but Det. Elliott responded: "'No, no no, . . . we got many hours to talk about a lot of things because we are gonna charge you with murder one.'" Lisojo: Tr. 510-11.)

Det. Elliott threatened to go to the media with a story about how Lisojo had raped and murdered Figueroa: "[E]verybody in America is gonna know who Rene Lisojo is. Then they gonna look at you like an animal." (Lisojo: Tr. 511-12, 517.) Lisojo was shown eighteen pictures of Figueroa's body which "freaked [him] out" because he had "never seen nothing like that." (Lisojo: Tr. 513, 515.) Lisojo stood up and tried to walk out of the room but the detectives stopped him, pushing him so that his "face hit the table." (Lisojo: Tr. 513-14.)

In order to prevent the police from going to the media, Lisojo agreed to cooperate. (Lisojo: Tr. 517-19.) Lisojo "knew [he] was innocent" but thought it best "to fight this behind closed doors in the courtroom as quietly as possible . . ." (Lisojo: Tr. 516-17.) Lisojo first gave a statement

to Det. Berberwich concerning the Christmas Eve murder, fabricating a story in order to appease the police.  (Lisojo: Tr. 516-20, 525-28.)  Lisojo then made a video-taped statement to an Assistant District Attorney regarding Figueroa's murder.  (Lisojo: Tr. 529.)  Lisojo only made that statement because he was told that he would not be charged for Figueroa's murder.  (Lisojo: Tr. 529.)  Lisojo did not tell the truth on the videotape; he did not return to Figueroa's apartment a second time and he did not kill Figueroa.  (Lisojo: Tr. 529.)

At the close of the case, defense counsel moved for a "trial order of dismissal on the ground that the People have not made out a case beyond a reasonable doubt," and rested on the record.  (Tr. 689.)  Justice Fisch denied the motion.  (Tr. 689.)

**The Charge Conference**

On January 27, 2003, Justice Fisch held a pre-summation charge conference.  (Tr. 649.)  Although the conference was held off-the-record, Justice Fisch later allowed defense counsel to make a record.  (Tr. 649.)  Defense counsel objected to the depraved indifference murder charge:

> [DEFENSE COUNSEL] MR. DUDLEY:  I'm objecting to the charge of depraved indifference murder.  Again the People are putting in every charge, and I don't see it as an alternative theory in this case.  So I'm objecting to it.
>
> If Your Honor is going to overrule my objection and is going to charge it, I'm going to ask Your Honor to charge manslaughter in the second degree reckless homicide.  I think there is a reasonable view of the statement that would support that.
>
> I'm not asking for self-defense, because my client denied it.
>
> THE COURT:  All right, I will let you know tomorrow.  Other than that, anything else?

MR. DUDLEY:  Other than that I have no objection to your charge sheet.  I think that's good.  It explains a lot of things and saves a lot of time.  I have no objection to that.

THE COURT:  I just want to see whether that's a statutory lesser included.

MR. DUDLEY:  Of course in the alternative.

THE COURT:  It['s] a statutory lesser included.  I just want to review the evidence. In view of the testimony of the medical examiner that the victim was bound - - - - let me review that and I will let you know tomorrow before summations.

(Tr. 649-50, emphasis added.)

On January 28, 2003, Justice Fisch addressed defense counsel's objection:

THE COURT:   Yesterday during our charge conference [defense counsel] Mr. Dudley had requested that I charge as a lesser included of manslaughter in the second degree as reckless, and I have reviewed that and I think this morning alternatively he asked for a manslaughter in the first degree.

I reviewed the evidence.  There is no reasonable view of the evidence that would support either charge so that motion is denied.

The brutality of the crime, the number of the stab wounds, location of the stab wounds, the force with which they were inflicted, testimony of the doctor that the victim was actually, was bound when stabbed fatally plus the other evidence in the case leads me to find that no reasonable view of the evidence would support those charges.

Mr. Dudley's exception is noted for the record.

(Tr. 666-67.)

**Summations**

In closing, defense counsel focused on the involuntariness of Lisojo's statements to the police, calling them "a coerced confession." (Tr. 692.) Defense counsel asserted that Lisojo was interrogated for over twelve hours, held in a eight-foot by ten-foot room, and pressured by two teams of detectives investigating two separate murders. (Tr. 710-11.) Defense counsel argued that the detectives were "crooked," "manufactur[ed] evidence" and used "dirty tactics." (Tr. 707, 709-10.) According to defense counsel, it was beyond the realm of the believable that Detective Elliot did not interrogate Lisojo before giving him <u>Miranda</u> warnings. (Tr. 710-11.) Moreover, defense counsel argued, the particularities in Lisojo's confession that were not consistent with the evidence proved it to be a false confession. (Tr. 694, 708-09.) In particular, defense counsel pointed out that no towel was found in Figueroa's apartment and that the nature of the stab wounds were inconsistent with the manner in which Lisojo said he inflicted them. (Tr. 694, 708-10.)

In response, the prosecutor characterized Lisojo as a man who lived in a fantasy world, "where if a woman simply talks to you that means she has a crush on you." (Tr. 712-13.) Lisojo "created this fantasy about [Figueroa] and he created the fantasy of what it would be like for them to be together." (Tr. 713.) However, when Figueroa rejected his advances, Lisojo's ego was "shattered" and he "brutally attacked her." (Tr. 712, 715-16.) According to the prosecutor, Lisojo was not a novice when it came to police interrogations; he was an experienced felon who had been read his <u>Miranda</u> warnings on numerous occasions. (Tr. 725-26.) It was implausible that someone with Lisojo's "vast experience with . . . the police . . . [would] think that it was in his best interest to

give a false confession." (Tr. 726.)  Instead, the prosecutor characterized Lisojo as somebody who would "say anything . . . if it serve[d] his own interest."  (Tr. 732.)  Lisojo's confession aside, the prosecutor contended that the physical evidence was sufficient to prove that Lisojo murdered Figueroa:  his saliva was found on her thigh and her blood was found on his uniform.  (Tr. 738.)

**The Jury Charge**

On January 29, 2003, Justice Fisch submitted three counts to the jury:  (1) second degree murder (intentional); (2) second degree murder (depraved indifference); and (3) fourth degree criminal possession of a weapon.  (Tr. 766-73.)

Justice Fisch explained the elements of intentional murder:

> [A] person is guilty of murder in the second degree when with intent to cause the death of another person, he or she causes the death of such person.
>
> Intent means conscious objective or purpose thus a person acts with intent to cause the death of another when that person's conscious objective or purpose is to cause the death of another.
>
> In order for you to find the defendant guilty of this crime, the People are required to prove from all of the evidence in the case beyond a reasonable doubt each of the following two elements:
>
> Number one, that on or about January 9, 2001 in the county of the Bronx, the defendant Renee Lisojo caused the death of Giselle Figueroa, and number two, that the defendant did so with the intent to cause the death of Giselle Figueroa.

(Tr. 767-68.)

Justice Fisch next advised the jury on the elements of depraved indifference homicide:

[A] person is guilty of murder in the second degree when, <u>under circumstances evincing a depraved indifference to human life, he or she recklessly engages in conduct which creates a grave risk of death to another person and there by causes the death of that person</u>.

. . . .

A person acts recklessly with respect to another person's death when that person engages in conduct which creates a substantial, unjustifiable and grave risk that another person's death will occur and when he or she is aware of and consciously disregards that risk and when that risk is of such nature and degree that disregard of it constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation.

. . . .

[W]hen reckless conduct is engaged in under circumstances evincing a depraved indifference to human life, the law regards that conduct as so serious, so egregious as to be the equivalent of intentional conduct.

. . . .

In determining whether a person's conduct evinced a depraved indifference to human life, a jury would have to decide whether the circumstances surrounding his or her reckless conduct[,] when objectively viewed[,] made it so uncaring, so callous, so dangerous and so inhuman as to demonstrate an attitude of total and utter disregard for the life of the person or persons endangered.

In order for you to find the defendant guilty of this crime, the People are required to prove from all the evidence in the case[,] beyond a reasonable doubt[,] each of the following three elements:

Number one, that on or about January 9th, 2001 in the county of the Bronx, the defendant Renee Lisojo caused the death of Gisselle Figueroa.

Number two, that the defendant did so by recklessly engaging in conduct which created a grave risk of death to Gisselle Figueroa.

> And number three, that the defendant engaged in such conduct under circumstances evincing a depraved indifference to human life.

(Tr. 768-71, emphasis added.)

Justice Fisch explained that the jury could consider these counts in any order they wished and that they could convict Lisojo of either but not both counts.  (Tr. 771.)  Finally, Justice Fisch advised that if the jury found Lisojo guilty of either count one or two, it need not consider the final charge of fourth degree criminal possession of a deadly weapon.  (Tr. 772.)

Following the jury charge, Justice Fisch held a conference in his robing room during which he inquired whether either party had objections to the charge.  (Tr. 779.)  Defense counsel made a request concerning the charge of voluntariness of Lisojo's statements to the police, which was denied.  (Tr. 779-80.)  Defense counsel then stated that he had no other objections "other than previously noted about my lesser included charge."  (Tr. 780.)

**Verdict and Sentence**

On January 30, 2003, at approximately 8:55 p.m., the jury returned a verdict.  (Tr. 789.)  The jury found Lisojo not guilty of count one, second degree murder (intentional), but guilty of count two, second degree murder (depraved indifference).  (Tr. 790.)

On February 28, 2003, Justice Fisch sentenced Lisojo.  (Dkt. No. 11: Sentencing Transcript ["S."].)  Before issuing his sentence, Justice Fisch addressed Lisojo's motion to set aside the verdict on the grounds that the court refused to charge reckless manslaughter as a lesser included offense of depraved indifference murder.  (S. 3.)   Justice Fisch denied that motion:

There is no reasonable view of the evidence that it supports a lesser charge of reckless manslaughter. The CJI charge, the charge I presented to the jury and under which the defendant was convicted[,] describes the distinction between depraved indifference and merely reckless conduct, quote conduct evincing a depraved [indifference] to human life is much more blameworthy than conduct which is merely reckless. . . . [I]n determining whether a person's conduct evinced a depraved [indifference] to human life the jury would have to decide whether circumstances surrounding his or her reckless conduct would objectively viewed ma[k]e it so uncaring, so callous, so dangerous, and so inhumane as to demonstrate an attitude of total and utter disregard for the life of the person or persons in danger. The evidence in the case established the following:

The victim was a slight 100 pounds, . . . and [had] multi[ple] stab wounds, a scarf tightly tied around her neck with a double knot clearly designed for no possible gasps of breath. Her legs tied with a bed sheet.

Dr. James Gil, medical examiner[,] testified about the autopsy results. The victim was beaten to a pulp with injuries to the arm, forearm, and lips, as well as injuries to her face, black eye, and [ ] left eye. Five stab wounds, three of which [were] to the left side of her neck. There were also stab wounds and cuts on the back of her torso. . . .The defendant stabbed her with such force the knife used broke when it came into contact with the bone. The stabbing severed arteries, blood vessels, cut through her clothing, skin, and ligaments. It was clear she struggled for her life. The multiple wounds and cuts and blunt injuries below her body had clearly evinced the defendant's uncontrollable rage and fury . . . .

Dr. Gil described the significance of the pattern of neck stab wounds and I quote, when we see a . . . tightly grouped area of wounds[,] that tells us that the person being stabbed was most likely incapacitated. In order for a person to get all those wounds in one place the person being stabbed was unconscious or restrained or somehow incapacitated so they could not move when they became stabbed in that location. It is clear . . . that the defendant first render the victim helpless while he proceeded to take her life punch by punch, stab by stab, cut by cut. There was virtually no part of her body he did not completely attack.

Dr. Gil also addressed the amount of force used and I quote again . . . the neck wounds have to go through the skin, muscles, ligaments, and even cuts and wounds. So for these wounds you are talking about a good amount of force. This isn't just a little nick or something. I mean it had to be driven into the neck to go through all those layers of clothing and tissue unquote. All this testimony concerning the

manner, method of the defendant causing the death of the victim clearly demonstrates the depravity and inhumanity of his action.  No reasonable view of the evidence [by] any stretch of the imagination could have supported a charge that the defendant's conduct was merely reckless.  It should also be noted that the defendant knew the victim [and,] after this brutal callous and indeed inhuman treatment, he left the remainder of the victim either already dead or dying.  He left her bleeding remains in her apartment to rot.  Even a corpse deserves respect and dignity.  No human being will behave that way.

> Accordingly, the motion to set aside the verdict is denied.

(S. 3-6.)  Lisojo stated that he "remain[s] not guilty."  (S. 17.)  Justice Fisch sentenced Lisojo:

The brutality and inhumanity of your crime was shocking and the photographs  and videos of the body of the deceased was riveting.  The expressions on the faces of the jurors was uniformly that of revulsion and disgust. . . .

. . . .

> Mr. Lisojo, you are a vicious, brutal, and uncaring human being.  For your conviction of the crime of murder in the second degree I sentence you to a term of 25 years to life.

(S. 20-21.)

**Lisojo's Direct Appeal**

In June 2005, represented by new counsel (the Center for Appellate Litigation), Lisojo's appeal to the First Department raised three claims:  (1) the evidence presented at trial was legally insufficient to sustain a conviction of depraved indifference murder; (2) Justice Fisch erroneously declined to charge the lesser included offense of second degree manslaughter (reckless homicide); and (3) the depraved indifference murder statute is unconstitutionally vague.  (Dkt. No. 5: Ex. 1: Lisojo 1st Dep't Br. at 2, 26-44.)

On March 2, 2006, the First Department unanimously affirmed Lisojo's conviction.

People v. Lisojo, 27 A.D.3d 215, 810 N.Y.S.2d 658 (1st Dep't 2006).  With regard to Lisojo's

insufficient evidence claim, the First Department concluded:

> [Lisojo]'s argument that the evidence was legally insufficient to support his conviction for depraved indifference murder because the evidence established intentional, rather than reckless, conduct is unpreserved, and we decline to review it in the interest of justice. Were we to review this claim, we would reject it. We also conclude that the evidence supporting the element of depraved indifference to human life was legally sufficient, and that the verdict was not against the weight of the evidence. The jury could have reasonably concluded, particularly if it credited portions of defendant's statement, that he lacked homicidal intent, but instead acted recklessly under circumstances evincing a depraved indifference to human life.

People v. Lisojo, 27 A.D.3d at 215, 810 N.Y.S.2d at 658 (citations omitted).

With regard to Lisojo's argument that the trial court erroneously declined to charge

the lesser included offense of second degree manslaughter, the First Department held:

> The court properly declined to submit manslaughter in the second degree to the jury as a lesser included offense of depraved indifference murder, since there was no reasonable view of the evidence to support submission of that charge.

People v. Lisojo, 27 A.D.3d at 215, 810 N.Y.S.2d at 658 (citations omitted).

Finally, with regard to Lisojo's claim that the depraved indifference murder statute

is unconstitutionally vague, the First Department ruled:

> [Lisojo] failed to preserve his constitutional argument concerning the relationship between depraved indifference murder and reckless manslaughter, and we decline to review it in the interest of justice. Were we to review this claim, we would reject it.

People v. Lisojo, 27 A.D.3d at 216, 810 N.Y.S.2d at 658 (citations omitted).

On June 21, 2006, the Court of Appeals granted Lisojo's application for leave to appeal. People v. Lisojo, 7 N.Y.3d 758, 819 N.Y.S.2d 884 (table) (2006). On November 16, 2006, the Court of Appeals upheld Lisojo's conviction, ruling that "[t]he issue raised on appeal was not preserved for this Court's review." People v. Lisojo, 7 N.Y.3d  873, 874, 826 N.Y.S.2d 173, 173 (2006).

**Lisojo's C.P.L. § 440 Motion**

On March 5, 2007, Lisojo filed a pro se motion to vacate the judgment pursuant to C.P.L. § 440.  (Dkt. No. 5: Ex. 7: Lisojo 440 Motion.)  Lisojo argued, inter alia, "[t]hat the evidence adduced at trial [was] legally insufficient to support [his] conviction of Murder in the Second-Degree under a theory of Depraved Indifference (PL 125.25(2))" (Lisojo 440 Motion at 1-a, 1-2, 10-15), and "[t]hat [he] received ineffective assistance [of] trial counsel" because his attorney "fail[ed] to put forth his objection concerning the insufficiency of the evidence at trial to support a finding of depraved indifference with the necessary specificity required by the Criminal Procedure Law." (Lisojo 440 Motion at 1-a, 1, 6-9, emphasis in original.)

The State responded that Lisojo received effective assistance of counsel, arguing that trial counsel could not be faulted for failing to presage a sea change in New York's twenty year-old deliberate indifference jurisprudence.  (Ex. 8: State 440 Br. at 6-12.)  Moreover, the State contended, Lisojo could not show that he was prejudiced by trial counsel's failure to make an insufficient evidence objection because such an objection would not have changed the outcome of the case, and may even have worked to Lisojo's detriment.  (State 440 Br. at 12-13.)  The State re-articulated its

position that the evidence adduced at trial was sufficient to sustain Lisojo's conviction; the evidence demonstrated that Lisojo "displayed 'uncommon brutality' as he tortured his victim and did not care if she was injured or killed." (State 440 Br. at 14-19.) Finally, the State contended that Lisojo's insufficient evidence argument was "procedurally barred" because the First Department had previously ruled on the merits and there had not been a "'retroactively effective change in the law controlling [the] issue'" since the affirmation of Lisojo's conviction. (State 440 Br. at 14-16.)

On April 30, 2008, Justice Fisch denied Lisojo's § 440 motion. (Ex. 10: Justice Fisch 4/30/08 Decision.) Justice Fisch held that Lisojo had received effective assistance of trial counsel, noting that at the time of trial "the issue of depraved indifference to human life focused on the degree of risk presented by the defendant's conduct rather than the subjective intent of the defendant," and it was not until two years after Lisojo's trial that the Court of Appeals held for the first time "that a charge of depraved indifference murder can never be sustained when there is evidence of intent to kill and a weapon is used in the commission of the crime." (Justice Fisch 4/30/08 Decision at 5-6.) According to Justice Fisch, "defense counsel made the appropriate arguments based upon the prevailing case law in existence at the time of [Lisojo's] trial. Defense counsel can hardly be considered ineffective for failing to make an argument based upon a case which had yet to be decided and to make an argument contrary to the twenty year precedent on the issue of depraved indifference." (Justice Fisch 4/30/08 Decision at 6.) As to Lisojo's claims that the evidence adduced at trial was insufficient to sustain a conviction of depraved indifference murder and that P.L. § 125.25(2) is unconstitutionally vague, Justice Fisch ruled that those claims were "procedurally

barred" because they were "addressed on the merits by the Appellate Division on the defendant's direct appeal." (Justice Fisch 4/30/08 Decision at 6-7 (citing C.P.L. § 440.10(2)(a)).)

On June 25, 2008, Lisojo moved pursuant to C.P.L. § 460.15 for leave to appeal Justice Fisch's denial of his § 440 motion. (Exs. 11 & 12: Lisojo 460 Motion.) In a supplemental letter submitted to the First Department on July 31, 2008, Lisojo argued, for the first time, that Justice Fisch's practice of "holding [off-the-record] pre-charge conference[s] and unclear rulings during post-verdict proceedings"deprived him of his "Due Process right's." (Ex. 14: Lisojo 7/31/08 1st Dep't Ltr. at 1.)

On January 27, 2009, the First Department denied leave to appeal from the denial of Lisojo's § 440 motion. (Ex. 17: 1/20/09 Order Denying Leave.)

## Lisojo's Federal Habeas Petition

Lisojo's pro se federal habeas corpus petition contends that: (1) the evidence adduced at trial was "legally insufficient to support [his] conviction of second-degree murder under a theory of depraved indifference, violating his right to due process"; (2) "the trial court's refusal to instruct the jury on second-degree reckless manslaughter deprived [him] of due process right to a fair trial and equal protection of the law by removing from the jury's consideration a complete defense dispositive of guilt or innocence"; and (3) he "received ineffective assistance by trial counsel, violating his U.S. constitutional rights under the Sixth and Fourteenth Amendments." (Dkt. No. 2: Pet. ¶ 13.)

## ANALYSIS

## I.   THE AEDPA REVIEW STANDARD

Before the Court can determine whether Lisojo is entitled to federal habeas relief, the Court must address the proper habeas corpus review standard under the Antiterrorism and Effective Death Penalty Act ("AEDPA").

In enacting the AEDPA, Congress significantly "modifie[d] the role of federal habeas courts in reviewing petitions filed by state prisoners."  Williams v. Taylor, 529 U.S. 362, 403, 120 S. Ct. 1495, 1518 (2000).  The AEDPA imposed a more stringent review standard, as follows:

> (d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2)  . . . was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2).[3]

---

[3]   See also, e.g., Knowles v. Mirzayance, 129 S. Ct. 1411, 1418 (2009); Henry v. Poole, 409 F.3d 48, 67 (2d Cir. 2005), cert. denied, 547 U.S. 1040, 126 S. Ct. 1622 (2006); Howard v. Walker, 406 F.3d 114, 121-22 (2d Cir. 2005); Cox v. Donnelly, 387 F.3d 193, 197 (2d Cir. 2004); Dallio v. Spitzer, 343 F.3d 553, 559-60 (2d Cir. 2003), cert. denied, 541 U.S. 961, 124 S. Ct. 1713 (2004); Eze v. Senkowski, 321 F.3d 110, 120 (2d Cir. 2003) ("AEDPA changed the landscape of federal habeas corpus review by 'significantly curtail[ing] the power of federal courts to grant the habeas petitions of state prisoners.'") (quoting Lainfiesta v. Artuz, 253 F.3d 151, 155 (2d Cir. 2001), cert. denied, 535 U.S. 1019, 122 S. Ct. 1611 (continued...)

The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) have "independent meaning." <u>Williams</u> v. <u>Taylor</u>, 529 U.S. at 404-05, 120 S. Ct. at 1519.[4]  Both, however, "restrict[] the source of clearly established law to [the Supreme] Court's jurisprudence." <u>Williams</u> v. <u>Taylor</u>, 529 U.S. at 412, 120 S. Ct. at 1523.[5]  "That federal law, as defined by the Supreme Court, may be either a generalized standard enunciated in the [Supreme] Court's case law or a bright-line rule designed to effectuate such a standard in a particular context." <u>Kennaugh</u> v.

---

[3]   (...continued)
(2002)).

[4]   Accord, <u>e.g.</u>, <u>Henry</u> v. <u>Poole</u>, 409 F.3d at 68; <u>Howard</u> v. <u>Walker</u>, 406 F.3d at 122; <u>Parsad</u> v. <u>Greiner</u>, 337 F.3d 175, 181 (2d Cir.), <u>cert. denied</u>, 540 U.S. 1091, 124 S. Ct. 962 (2003); <u>Jones</u> v. <u>Stinson</u>, 229 F.3d 112, 119 (2d Cir. 2000); <u>Lurie</u> v. <u>Wittner</u>, 228 F.3d 113, 125 (2d Cir. 2000), <u>cert. denied</u>, 532 U.S. 943, 121 S. Ct. 1404 (2001); <u>Clark</u> v. <u>Stinson</u>, 214 F.3d 315, 320 (2d Cir. 2000), <u>cert. denied</u>, 531 U.S. 1116, 121 S. Ct. 865 (2001).

[5]   Accord, <u>e.g.</u>, <u>Georgison</u> v. <u>Donelli</u>, 588 F.3d 145, 153-54 (2d Cir. 2009); <u>Dunlap</u> v. <u>Burge</u>, 583 F.3d 160, 164 (2d Cir.), <u>cert. denied</u>, 130 S. Ct. 642 (2009); <u>Carey</u> v. <u>Musladin</u>, 549 U.S. 70, 127 S. Ct. 649, 654 (2006) ("Given the lack of holdings from the Court regarding this [issue], it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'"); <u>Yarborough</u> v. <u>Alvarado</u>, 541 U.S. 652, 659, 124 S. Ct. 2140, 2147 (2004) ("We look for 'the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.'"); <u>Wiggins</u> v. <u>Smith</u>, 539 U.S. 510, 519, 123 S. Ct. 2527, 2534 (2003); <u>Lockyer</u> v. <u>Andrade</u>, 538 U.S. 63, 72, 123 S. Ct. 1166, 1172 (2003) ("Section 2254(d)(1)'s 'clearly established' phrase 'refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision.'"); <u>Hargett</u> v. <u>Giambruno</u>, 291 Fed. Appx. 402, 403 (2d Cir. 2008); <u>Howard</u> v. <u>Walker</u>, 406 F.3d at 122; <u>Tueros</u> v. <u>Greiner</u>, 343 F.3d 587, 591 (2d Cir. 2003), <u>cert. denied</u>, 541 U.S. 1047, 124 S. Ct. 2171 (2004); <u>Parsad</u> v. <u>Greiner</u>, 337 F.3d at 181; <u>DelValle</u> v. <u>Armstrong</u>, 306 F.3d 1197, 1200 (2d Cir. 2002); <u>Yung</u> v. <u>Walker</u>, 341 F.3d 104, 109-110 (2d Cir. 2003); <u>Kennaugh</u> v. <u>Miller</u>, 289 F.3d 36, 42 (2d Cir.), <u>cert. denied</u>, 537 U.S. 909, 123 S. Ct. 251 (2002); <u>Loliscio</u> v. <u>Goord</u>, 263 F.3d 178, 184 (2d Cir. 2001); <u>Sellan</u> v. <u>Kuhlman</u>, 261 F.3d 303, 309 (2d Cir. 2001).

Miller, 289 F.3d at 42; accord, e.g., Davis v. Grant, 532 F.3d 132, 140 (2d Cir. 2008), cert. denied, 129 S. Ct. 1312, 2009 WL 425166 at *1 (Feb. 23, 2009).  "A petitioner can not win habeas relief solely by demonstrating that the state court unreasonably applied Second Circuit precedent." Yung v. Walker, 341 F.3d at 110; accord, e.g., DelValle v. Armstrong, 306 F.3d at 1200.

> As to the "contrary to" clause:
>
> A state-court decision will certainly be contrary to [Supreme Court] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases. . . .  A state-court decision will also be contrary to [the Supreme] Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent.

Williams v. Taylor, 529 U.S. at 405-06, 120 S. Ct. at 1519-20.[6/]

> In Williams, the Supreme Court explained that "[u]nder the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing

---

[6/]    Accord, e.g., Knowles v. Mirzayance, 129 S. Ct. at 1419 (The Supreme "Court has held on numerous occasions that it is not 'an unreasonable application of clearly established federal law' for a state court to decline to apply a specific legal rule that has not been squarely established by this [Supreme] Court.") (quotation omitted); Brown v. Payton, 544 U.S. 133, 125 S. Ct. 1432, 1438-39 (2005); Bell v. Cone, 543 U.S. 447, 452-53, 125 S. Ct. 847, 851 (2005); Price v. Vincent, 538 U.S. 634, 640, 123 S. Ct. 1848, 1853 (2003); Lockyer v. Andrade, 123 S. Ct. at 1173-74; Ortiz v. N.Y.S. Parole in Bronx, N.Y., 586 F.3d 149, 156 (2d Cir. 2009); Dunlap v. Burge, 583 F.3d at 164; Davis v. Grant, 532 F.3d at 140; Hawkins v. Costello, 460 F.3d 238, 242 (2d Cir. 2006), cert. denied, 549 U.S. 1215, 127 S. Ct. 1267 (2007); Henry v. Poole, 409 F.3d at 68; Howard v. Walker, 406 F.3d at 122; Rosa v. McCray, 396 F.3d 210, 219 (2d Cir.), cert. denied, 546 U.S. 889, 126 S. Ct. 215 (2005); Tueros v. Greiner, 343 F.3d at 591; DelValle v. Armstrong, 306 F.3d at 1200; Yung v. Walker, 341 F.3d at 109; Kennaugh v. Miller, 289 F.3d at 42; Loliscio v. Goord, 263 F.3d at 184; Lurie v. Wittner, 228 F.3d at 127-28.

legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." <u>Williams</u> v. <u>Taylor</u>, 529 U.S. at 413, 120 S. Ct. at 1523.[7]  However, "[t]he term 'unreasonable' is . . . difficult to define." <u>Williams</u> v. <u>Taylor</u>, 529 U.S. at 410, 120 S. Ct. at 1522.  The Supreme Court made clear that "an <u>unreasonable</u> application of federal law is different from an <u>incorrect</u> application of federal law." <u>Id</u>.[8]  Rather, the issue is "whether the state court's application of clearly established federal law was objectively unreasonable." <u>Williams</u> v. <u>Taylor</u>,

---

[7]     Accord, <u>e.g.</u>, <u>Wadddington</u> v. <u>Sarausad</u>, 129 S. Ct. 823, 831 (2009); <u>Brown</u> v. <u>Payton</u>, 544 U.S. at 141, 125 S. Ct. at 1439; <u>Wiggins</u> v. <u>Smith</u>, 539 U.S. at 520, 123 S. Ct. at 2534-35; <u>Brisco</u> v. <u>Ercole</u>, 565 F.3d 80, 87 (2d Cir.), <u>cert. denied</u>, 130 S. Ct. 739 (2009); <u>Jones</u> v. <u>West</u>, 555 F.3d 90, 96 (2d Cir. 2009); <u>Davis</u> v. <u>Grant</u>, 532 F.3d at 140; <u>Lynn</u> v. <u>Bliden</u>, 443 F.3d 238, 246 (2d Cir. 2006), <u>cert. denied</u>, 549 U.S. 1257, 127 S. Ct. 1383 (2007); <u>Howard</u> v. <u>Walker</u>, 406 F.3d at 122; <u>Parsad</u> v. <u>Greiner</u>, 337 F.3d at 181.

[8]     See also, <u>e.g.</u>, <u>Wadddington</u> v. <u>Sarausad</u>, 129 S. Ct. at 831; <u>Yarborough</u> v. <u>Alvarado</u>, 541 U.S. at 664, 124 S. Ct. at 2150; <u>Wiggins</u> v. <u>Smith</u>, 539 U.S. at 520, 123 S. Ct. at 2535; <u>Price</u> v. <u>Vincent</u>, 538 U.S. at 641, 123 S. Ct. at 1853 ("As we have explained: '[A] federal habeas court may not issue the writ simply because that court concludes that the state-court decision applied [a Supreme Court case] incorrectly.'") (quoting <u>Woodford</u> v. <u>Visciotti</u>, 537 U.S. 19, 24-25, 123 S. Ct. 357, 360 (2002)); <u>Lockyer</u> v. <u>Andrade</u>, 538 U.S. at 75, 123 S. Ct. at 1175; <u>Dunlap</u> v. <u>Burge</u>, 583 F.3d at 165-66 (A "federal court might agree with a petitioner that the relevant federal law should have been interpreted differently than the way it was interpreted by the state court yet still conclude that the state court's application of federal law was not unreasonable."); <u>Brisco</u> v. <u>Ercole</u>, 565 F.3d at 87-88; <u>Jones</u> v. <u>West</u>, 555 F.3d at 96; <u>Davis</u> v. <u>Grant</u>, 532 F.3d at 140; <u>Hawkins</u> v. <u>Costello</u>, 460 F.3d at 243; <u>Lynn</u> v. <u>Bliden</u>, 443 F.3d at 246; <u>Henry</u> v. <u>Poole</u>, 409 F.3d at 68; <u>Howard</u> v. <u>Walker</u>, 406 F.3d at 122; <u>Rosa</u> v. <u>McCray</u>, 396 F.3d at 219; <u>Cox</u> v. <u>Donnelly</u>, 387 F.3d at 197; <u>Eze</u> v. <u>Senkowski</u>, 321 F.3d at 124-25; <u>DelValle</u> v. <u>Armstrong</u>, 306 F.3d at 1200 ("With regard to issues of law, therefore, if the state court's decision was not an unreasonable application of, or contrary to, clearly established federal law as defined by Section 2254(d), we may not grant habeas relief even if in our judgment its application was erroneous.").

529 U.S. at 409, 120 S. Ct. at 1521.[9/]  "Objectively unreasonable" is different from "clear error."

Lockyer v. Andrade, 538 U.S. at 75, 123 S. Ct. at 1175 ("The gloss of clear error fails to give proper

deference to state courts by conflating error (even clear error) with unreasonableness."). This is a

"substantially higher threshold" than incorrectness.  Knowles v. Mirzayance, 129 S. Ct. at 1420.[10/]

"[T]he range of reasonable judgment can depend in part on the nature of the relevant rule."

Yarborough v. Alvarado, 541 U.S. at 663, 124 S. Ct. at 2149.[11/]  "Even if the state court issues a

---

[9/]     Accord, e.g., Yarborough v. Alvarado, 541 U.S. at 664, 124 S. Ct. at 2150; Wiggins v. Smith, 539 U.S. at 520-21, 123 S. Ct. at 2535; Price v. Vincent, 538 U.S. at 641, 123 S. Ct. at 1853; Lockyer v. Andrade, 538 U.S. at 75, 123 S. Ct. at 1174-75; Woodford v. Visciotti, 537 U.S. at 25-27, 123 S. Ct. at 360-61; Dunlap v. Burge, 583 F.3d at 165; Davis v. Grant, 532 F.3d at 140; Mosby v. Senkowski, 470 F.3d 515, 519 (2d Cir. 2006), cert. denied, 128 S. Ct. 75 (2007); Hawkins v. Costello, 460 F.3d at 243; Lynn v. Bliden, 443 F.3d at 246; Henry v. Poole, 409 F.3d at 68; Howard v. Walker, 406 F.3d at 122; Cox v. Donnelly, 387 F.3d at 197; Eze v. Senkowski, 321 F.3d at 125; Ryan v. Miller, 303 F.3d 231, 245 (2d Cir. 2002); Loliscio v. Goord, 263 F.3d at 184; Lurie v. Wittner, 228 F.3d at 128-29.

[10/]     However, the Second Circuit has explained "that while '[s]ome increment of incorrectness beyond error is required . . . the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence.'" Jones v. Stinson, 229 F.3d at 119 (quoting Francis S. v. Stone, 221 F.3d 100, 111 (2d Cir. 2000)).; accord, e.g., Brisco v. Ercole, 565 F.3d at 88; Jones v. West, 555 F.3d at 96; Brown v. Alexander, 543 F.3d 94, 100 (2d Cir. 2008) ("[W]e have observed that the "unreasonable application 'standard falls somewhere between merely erroneous and unreasonable to all reasonable jurists.'"); Davis v. Grant, 532 F.3d at 140; Lynn v. Bliden, 443 F.3d at 246; Henry v. Poole, 409 F.3d at 68; Howard v. Walker, 406 F.3d at 122; Rosa v. McCray, 396 F.3d at 219; Cox v. Donnelly, 387 F.3d at 197, 200-01; Eze v. Senkowski, 321 F.3d at 125; Ryan v. Miller, 303 F.3d at 245; Yung v. Walker, 341 F.3d at 110; Loliscio v. Goord, 263 F.3d at 184.

[11/]     The Supreme Court explained:

        [T]he range of reasonable judgment can depend in part on the nature of the relevant
                                                                            (continued...)

decision 'contrary to' clearly established Supreme Court law, . . . a petitioner 'cannot obtain relief . . . unless application of a *correct* interpretation of that [Supreme Court] decision leads to the conclusion that his rights were violated.'" Cousin v. Bennett, 511 F.3d 334, 339 (2d Cir.), cert. denied, 128 S. Ct. 2910 (2008).

Moreover, the Second Circuit has held "that a state court determination is reviewable under AEDPA if the state decision unreasonably failed to extend a clearly established, Supreme Court defined, legal principle to situations which that principle should have, in reason, governed." Kennaugh v. Miller, 289 F.3d at 45.[12]

---

[11]    (...continued)
rule.  If a legal rule is specific, the range may be narrow.  Applications of the rule may be plainly correct or incorrect.  Other rules are more general, and their meaning must emerge in application over the course of time.  Applying a general standard to a specific case can demand a substantial element of judgment.  As a result, evaluating whether a rule application was unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.

Yarborough v. Alvarado, 541 U.S. at 663, 124 S. Ct. at 2149; accord, e.g., Knowles v. Mirzayance, 129 S. Ct. at 1426 (Where the Supreme Court "standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard."); Ortiz v. N.Y.S. Parole in Bronx, N.Y., 586 F.3d at 157; Dunlap v. Burge, 583 F.3d at 166; Hawkins v. Costello, 460 F.3d at 243.

[12]    Accord, e.g., Davis v. Grant, 532 F.3d at 140-41; Tueros v. Greiner, 343 F.3d at 591; Yung v. Walker, 341 F.3d at 109; see Yarborough v. Alvarado, 541 U.S. at 665-66, 124 S. Ct. at 2150-51 ("The petitioner contends that if a habeas court must extend a rationale before it can apply to the facts at hand then the rationale cannot be clearly established at the time of the state-court decision.  There is force to this argument.  Section 2254(d)(1) would be undermined if habeas courts introduced rules not clearly established under the guise of extensions to existing law.  At the same time, the difference between applying a rule and
(continued...)

Under the AEDPA, in short, the federal courts "must give the state court's adjudication a high degree of deference." Yung v. Walker, 341 F.3d at 109; accord, e.g., Bell v. Cone, 543 U.S. at 455, 125 S. Ct. at 853; Mosby v. Senkowski, 470 F.3d at 519. "[I]t is the petitioner's burden to demonstrate that the state court applied the relevant clearly established law to the record in an unreasonable manner." Acosta v. Artuz, 575 F.3d 177, 184 (2d Cir. 2009); accord, e.g., Georgison v. Donelli, 588 F.3d at 154.

Even where the state court decision does not specifically refer to either the federal claim or to relevant federal case law, the deferential AEDPA review standard applies:

> For the purposes of AEDPA deference, a state court "adjudicate[s]" a state prisoner's federal claim on the merits when it (1) disposes of the claim "on the merits," and (2) reduces its disposition to judgment. When a state court does so, a federal habeas court must defer in the manner prescribed by 28 U.S.C. § 2254(d)(1) to the state court's decision on the federal claim – even if the state court does not explicitly refer to either the federal claim or to relevant federal case law.

Sellan v. Kuhlman, 261 F.3d at 312; accord, e.g., Bell v. Cone, 543 U.S. at 455, 125 S. Ct. at 853 ("Federal courts are not free to presume that a state court did not comply with constitutional dictates on the basis of nothing more than a lack of citation."); Early v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362, 365 (2002) (State court not required to cite Supreme Court cases, or even be aware of them, to be entitled to AEDPA deference, "so long as neither the reasoning nor the result of the state-court decision contradicts them."); Wilson v. Mazzuca, 570 F.3d 490, 499 (2d Cir. 2009) ("Where, as here,

---

12/    (...continued)
extending it is not always clear. Certain principles are fundamental enough that when new factual permutations arise, the necessity to apply the earlier rule will be beyond doubt.") (citations omitted).

'a state court fails to articulate the rationale underlying its rejection of a petitioner's claim, and when that rejection is on the merits, the federal court will focus its review on whether the state court's ultimate decision was an unreasonable application of clearly established Supreme Court precedent.'"[13]  Even if the federal court holds an evidentiary hearing, the deferential AEDPA review standard applies.  Wilson v. Mazzuca, 570 F.3d at 501-02 ("Where . . . a district court has performed additional fact finding, the court must then ask whether the state court's decision 'was contrary to, or involved an unreasonable application of, clearly established Federal law,' . . . in light of any newly-discovered facts. . . . [W]e are directed to apply the same AEDPA standard that would otherwise be in force, now in light of the new information that has been obtained through a § 2254(e) hearing.").

Where the state court decision is not clear as to whether it rests on federal law or state procedural law, the Second Circuit in Jimenez v. Walker, 458 F.3d 130, 145-46 (2d Cir. 2006), cert. denied, 549 U.S. 1133, 127 S. Ct. 976 (2007), instructed that the court must "examine the three clues

---

[13]  See also, e.g., Mosby v. Senkowski, 470 F.3d at 519; Hawkins v. Costello, 460 F.3d at 243; Lynn v. Bliden, 443 F.3d at 246; Howard v. Walker, 406 F.3d at 122; Rosa v. McCray, 396 F.3d at 220; Wade v. Herbert, 391 F.3d 135, 140 (2d Cir. 2004) (Appellate Division held claim was "'without merit.'"  "Such a summary determination, even absent citation of federal case law, is a determination 'on the merits' and as such requires the deference specified by § 2254."  Moreover, "if any reasonable ground was available [for the state court's decision], we must assume the [state] court relied on it."); Francolino v. Kuhlman, 365 F.3d 137, 141 (2d Cir.) (Where "the Appellate Division concluded its opinion by stating that it had 'considered and rejected defendants' remaining claims,'" AEDPA deference applies.), cert. denied, 543 U.S. 872, 125 S. Ct. 110 (2004); Jenkins v. Artuz, 294 F.3d 284, 291 (2d Cir. 2002) ("In Sellan, we found that an even more concise Appellate Division disposition – the word 'denied' – triggered AEDPA deference.").

laid out in <u>Coleman</u>, <u>Quirama</u> and <u>Sellan</u>" – that is, "(1) the face of the state-court opinion,
(2) whether the state court was aware of a procedural bar, and (3) the practice of state courts in
similar circumstances." <u>Jimenez</u> v. <u>Walker</u>, 458 F.3d at 145 & n.16; <u>accord</u>, <u>e.g.</u>, <u>Clark</u> v. <u>Perez</u>, 510
F.3d 382, 394 (2d Cir.), <u>cert. denied</u>, 129 S. Ct. 130 (2008).  Using these three factors, the court
should classify the decision as either:

> (1)    fairly appearing to rest primarily on federal law or to be interwoven
> with federal law or
>
> (2)    fairly appearing to rest primarily on state procedural law.

> Absent a clear and express statement of reliance on a state procedural bar, the
> <u>Harris</u> presumption applies to decisions in the first category and deems them to rest
> on the merits of the federal claim.  Such decisions are not procedurally barred and
> must be afforded AEDPA deference as adjudications "on the merits" under 28 U.S.C.
> § 2254(d).  The <u>Harris</u> presumption does not apply to decisions in the second
> category, which show themselves to rest on an independent state procedural bar.  Nor
> does it apply to decisions in the first category which contain a clear statement of
> reliance on a state procedural bar.  No AEDPA deference is due to these decisions,
> but the state may successfully assert that habeas relief is foreclosed provided that the
> independent state procedural bar is adequate to support the judgment and that neither
> cause and prejudice nor a fundamental miscarriage of justice is shown.

> The effect of these rules is to present federal habeas courts with a binary
> circumstance: we either apply AEDPA deference to review a state court's disposition
> of a federal claim or refuse to review the claim because of a procedural bar properly
> raised.  The middle ground . . . does not exist.

<u>Jimenez</u> v. <u>Walker</u>, 458 F.3d at 145-46 (citations & fns. omitted); <u>accord</u>, <u>e.g.</u>, <u>Hawkins</u> v. <u>Costello</u>,
460 F.3d at 242 ("In <u>Jimenez</u> v. <u>Walker</u>, we recently made clear that when a state court rejects a
petitioner's claim as either unpreserved or without merit, the conclusive presumption is that the
adjudication rested on the merits.").  Of course, "[i]f there is no [state court] adjudication on the

merits [and no procedural bar], then the pre-AEDPA, de novo standard of review applies." Cotto
v. Herbert, 331 F.3d 217, 230 (2d Cir. 2003); see also Wilson v. Mazzuca, 570 F.3d at 500 n.8;
Jimenez v. Walker, 458 F.3d at 145 n.17.

Finally, "[i]f [the] court finds that the state court engaged in an unreasonable
application of established law, resulting in constitutional error, it must next consider whether such
error was harmless." Howard v. Walker, 406 F.3d at 122.

In addition to the standard of review of legal issues, the AEDPA provides a
deferential review standard for state court factual determinations: "a determination of a factual issue
made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1); accord, e.g., Lynn
v. Bliden, 443 F.3d at 246-47; Rosa v. McCray, 396 F.3d at 220. "The petitioner bears the burden
of 'rebutting the presumption of correctness by clear and convincing evidence.'" Parsad v. Greiner,
337 F.3d at 181 (quoting § 2254(e)(1)); accord, e.g., Brown v. Alexander, 543 F.3d at 100; Lynn v.
Bliden, 443 F.3d at 246-47.

## II.   LISOJO'S LEGAL SUFFICIENCY CLAIM SHOULD BE DENIED

Lisojo raised on direct appeal the same claim – that the evidence adduced at trial was
"legally insufficient to support [his] conviction of second-degree murder under a theory of depraved
indifference . . . ." – that he now raises in his habeas petition. (See pages 1 & 30 above.)  The First
Department rejected that claim, ruling that:

> [Lisojo]'s argument that the evidence was legally insufficient to support his
> conviction for depraved indifference murder because the evidence established
> intentional, rather than reckless, conduct is unpreserved, and we decline to review it
> in the interest of justice. Were we to review this claim, we would reject it. We also

conclude that the evidence supporting the element of depraved indifference to human life was legally sufficient, and that the verdict was not against the weight of the evidence. The jury could have reasonably concluded, particularly if it credited portions of defendant's statement, that he lacked homicidal intent, but instead acted recklessly under circumstances evincing a depraved indifference to human life.

People v. Lisojo, 27 A.D.3d 215, 215, 810 N.Y.S.2d 658, 658 (1st Dep't 2006) (citations omitted).

The Court of Appeals upheld the First Department's ruling, holding that:  "[t]he issue raised on appeal was not preserved for this Court's review."  People v. Lisojo, 7 N.Y.3d  873, 826 N.Y.S.2d 173 (2006).

### A.    The Adequate & Independent State Ground Doctrine

The Supreme Court has made clear that the "adequate and independent state ground doctrine applies on federal habeas," such that "an adequate and independent finding of procedural default will bar federal habeas review of the federal claim, unless the habeas petitioner can show cause for the default and prejudice attributable thereto, or demonstrate that failure to consider the federal claim will result in a fundamental miscarriage of justice." Harris v. Reed, 489 U.S. 255, 262, 109 S. Ct. 1038, 1043 (1989) (citations & internal quotations omitted).[14]

"[I]n order to preclude federal review [under the adequate and independent doctrine], the last state court to render judgment must 'clearly and expressly state . . . that its judgment rest[ed]

---

[14]    See also, e.g., Schlup v. Delo, 513 U.S. 298, 314-16, 115 S. Ct. 851, 860-61 (1995); Coleman v. Thompson, 501 U.S. 722, 735, 111 S. Ct. 2546, 2557 (1991); Murray v. Carrier, 477 U.S. 478, 485-88, 496, 106 S. Ct. 2639, 2644-45, 2649-50 (1986); Jones v. Vacco, 126 F.3d 408, 415 (2d Cir. 1997); Garcia v. Lewis, 188 F.3d 71, 76-77 (2d Cir. 1999); Reyes v. Keane, 118 F.3d 136, 138-40 (2d Cir. 1997); Glenn v. Bartlett, 98 F.3d 721, 724 (2d Cir. 1996), cert. denied, 520 U.S. 1108, 117 S. Ct. 1116 (1997); Velasquez v. Leonardo, 898 F.2d 7, 9 (2d Cir. 1990).

on a state procedural bar.'" Jones v. Vacco, 126 F.3d at 415 (quoting Glenn v. Bartlett, 98 F.3d at 724). The Second Circuit has made clear that "federal habeas review is foreclosed when a state court has expressly relied on a procedural default as an independent and adequate state ground, even where the state court has also ruled in the alternative on the merits of the federal claim." Velasquez v. Leonardo, 898 F.2d at 9; accord, e.g., Harris v. Reed, 489 U.S. at 264 n.10, 109 S. Ct. at 1044 n.10 ("[A] state court need not fear reaching the merits of a federal claim in an alternative holding. By its very definition, the adequate and independent state ground doctrine requires the federal court to honor a state holding that is a sufficient basis for the state court's judgment, even when the state court also relies on federal law.").[15/] Thus, "as long as the state court explicitly invokes a state procedural bar rule as a separate basis for decision," the adequate and independent doctrine "curtails reconsideration of the federal issue on federal habeas." Harris v. Reed, 489 U.S. at 264 n.10, 109 S. Ct. at 1044 n.10.

> State courts are not required to use any particular language:

> > We encourage state courts to express plainly, in every decision potentially subject to federal review, the grounds upon which their judgments rest, but we will not impose on state courts the responsibility for using particular language in every case in which a state prisoner presents a federal claim – every state appeal, every denial of state collateral review – in order that federal courts might not be bothered with reviewing state law and the record in the case.

Coleman v. Thompson, 501 U.S. at 739, 111 S. Ct. at 2559.

---

[15/]     See, e.g., Garcia v. Lewis, 188 F.3d at 77-82; Glenn v. Bartlett, 98 F.3d at 724-25; see also, e.g., Santiago v. People, 97 Civ. 5076, 1998 WL 803414 at *4 (S.D.N.Y. Oct. 13, 1998) ("When the state court rejects a claim both on the merits and because it was waived under the state's procedural law, review of the claim on a federal habeas corpus petition is barred.").

Unlike the situation where the state court holds that claims were either unpreserved or without merit, which the Second Circuit has found is usually too ambiguous to preclude habeas review, e.g., Galarza v. Keane, 252 F.3d 630, 637 (2d Cir. 2001), here the First Department explicitly found Lisojo's claim "unpreserved."  The fact that the First Department also stated the conclusion it would reach on the merits if it were to review the claim does not change the result.  See, e.g., Fama v. Comm'r of Corr. Servs., 235 F.3d 804, 810-11 & n.4 (2d Cir. 2000) ("where a state court says that a claim is 'not preserved for appellate review' and then ruled 'in any event' on the merits, such a claim is not preserved"); Glenn v. Bartlett, 98 F.3d at 724-25 & n.3 (state decision which denied prosecutorial misconduct claim as not preserved for appellate review represented an independent and adequate state procedural ground even though court addressed merits of claim "in the interests of justice"); Velasquez v. Leonardo, 898 F.2d at 9 (state decision which denied claims as procedurally barred but then alternatively addressed merits rested on adequate and independent state grounds). Thus, the First Department's decisions as to Lisojo's claims regarding sufficiency of the evidence unambiguously rested on a state procedural ground.

The Supreme Court has established that "the procedural bar doctrine only precludes habeas review when the state procedural ground is firmly established and regularly followed by the state courts." Simpson v. Portuondo, 01 Civ. 8744, 2002 WL 31045862 at *4 (S.D.N.Y. June 4, 2002) (citing James v. Kentucky, 466 U.S. 341, 348-49, 104 S. Ct. 1830, 1835 (1984)); see, e.g., Lee

v. <u>Kemna</u>  534 U.S. 362, 376, 122 S.Ct. 877, 885 (2002) ("[V]iolation of 'firmly established and regularly followed' state rules . . . [are] adequate to foreclose review of a federal claim.").[16]

Even if a state rule is discretionary, it can serve as an adequate and independent state ground, as the Supreme Court recently made clear:

> We hold that a discretionary state procedural rule can serve as an adequate ground to bar federal habeas review.  Nothing inherent in such a rule renders it inadequate for purposes of the adequate state ground doctrine.  To the contrary, a discretionary rule can be "firmly established" and "regularly followed" – even if the appropriate exercise of discretion may permit consideration of a federal claim in some cases but not others.

<u>Beard</u> v. <u>Kindler</u>, 130 S. Ct. 612, 618 (2009).

New York's contemporaneous objection rule, codified in Criminal Procedure Law § 470.05(2), provides that issues "not raised at trial may not be considered for the first time on appeal." <u>People</u> v. <u>Thomas</u>, 50 N.Y.2d 467, 471, 429 N.Y.S.2d 584 (1980) (citing C.P.L. § 470.05(2)).[17]  Moreover, a party must make a specific protest at the time of a claimed error to

---

[16]   <u>See also</u>, <u>e.g.</u>, <u>Clark</u> v. <u>Perez</u>, 510 F.3d 382, 391 (2d Cir. 2008) ("To determine whether a state procedural bar is 'adequate to support the judgment,' a federal habeas court should look to whether 'the state rule at issue . . . is firmly established and regularly followed.'")(citations omitted); <u>Murden</u> v. <u>Artuz</u>, 497 F.3d 178, 192 (2d Cir. 2007) (To be "adequate," the state procedural requirement must be "'firmly established and regularly followed by the state in question' in the specific circumstances presented in the instant case."); <u>Cotto</u> v. <u>Herbert</u>, 331 F.3d 217, 239 (2d Cir. 2003) ("'State courts may not avoid deciding federal issues by invoking procedural rules that they do not apply evenhandedly to all similar claims.'"); <u>Nunez</u> v. <u>Conway</u>, 07 Civ. 7560,  2010 WL 234826 at* 9 (S.D.N.Y. Jan. 20, 2010); <u>Roldan</u> v. <u>Ercole</u>, 08 Civ. 6548, 2009 WL 2191176 at *3 (S.D.N.Y. July 20, 2009).

[17]   C.P.L. § 470.05(2) provides, in relevant part:

(continued...)

preserve an issue for appellate review. E.g., People v. Hardy, 4 N.Y.3d 192, 197 n.3, 791 N.Y.S.2d

513, 517 n.3 (2005).  Hence, if a party neglects to raise a claim in the trial court, or fails to specify

the grounds for an objection (either because the objection is general, or because it specifies a

different ground than that raised on appeal), state appellate courts generally will not consider that

claim.  E.g., People v. Cona, 49 N.Y.2d 26, 33, 424 N.Y.S.2d 146, 148 (1979); see also, e.g., Olivo

v. Thorton, 05 Civ. 3237, 2005 WL 3292542 at *10 (S.D.N.Y. Dec. 6, 2005) (Peck, M.J.) ("Under

New York law, a party's failure to specify the grounds for its general objection also renders its

argument unpreserved for appellate review.") (citing N.Y. cases), report & rec. adopted, 2006 WL

2689889 (S.D.N.Y. Sept. 19, 2006).

   To properly preserve a challenge to the legal sufficiency of a conviction, "a defendant

must move for a trial order of dismissal, and the argument must be 'specifically directed' at the error

being urged."  People v. Hawkins, 11 N.Y.3d 484, 492, 872 N.Y.S.2d 395, 399 (2008).  General

---

[17]/    (...continued)
    For the purposes of appeal, a question of law with respect to a ruling or instruction
    of a criminal court during a trial or proceeding is presented when a protest thereto
    was registered, by the party claiming error, at the time of such ruling or instruction
    or at any subsequent time when the court had an opportunity of effectively changing
    the same.  Such protest need not be in the form of an "exception" but is sufficient if
    the party made his position with respect to the ruling or instruction known to the
    court, or if in response to a protest by a party, the court expressly decided the
    question raised on appeal.  In addition, a party who without success has either
    expressly or impliedly sought or requested a particular ruling or instruction, is
    deemed to have thereby protested the court's ultimate disposition of the matter or
    failure to rule or instruct accordingly sufficiently to raise a question of law with
    respect to such disposition or failure regardless of whether any actual protest thereto
    was registered.

motions to dismiss that do not set forth the specific grounds for the alleged insufficiency of the

evidence fail to preserve the issue.  E.g., People v. Hawkins, 11 N.Y.3d at 492, 872 N.Y.S.2d at 399

("[G]eneral motions simply do not create questions of law for this Court's review."); People v. Gray,

86 N.Y.2d 10, 20, 629 N.Y.S.2d 173, 176 (1995) ("The chief purpose of demanding notice through

objection or motion in a trial court, as with any specific objection, is to bring the claim to the trial

court's attention. A general motion fails at this task.  As a practical matter, a general motion to

dismiss is often no more helpful to the Trial Judge than would be a motion predicated on an

erroneous ground.") (citations omitted).

      Here, Lisojo's counsel never specifically challenged the sufficiency of the evidence

establishing depraved indifference murder at trial.  At the close of the State's case, Lisojo's counsel

moved to dismiss on the ground that "the People have not made out a prima facie case."  (See page

13 above.)  Similarly, at the close of all the evidence, Lisojo's counsel moved to dismiss "on the

ground that the People have not made out a case beyond a reasonable doubt," and merely "rest[ed]"

on the record."  (See page 19 above.)  Finally, during a pre-summation charge conference, trial

counsel objected to the depraved indifference murder charge asserting that he did not view it as an

"alternative theory" in the case.  (See pages 19-20 above.)[18/]  Importantly, Lisojo's counsel never

---

[18/]    Citing Fernandez v. Smith, 558 F. Supp. 2d 480, 493 (S.D.N.Y. 2008), Lisojo argues that he should be given the benefit of the doubt as to what objections counsel may have made during the  off-the-record pre-charge conference.  (Dkt. No. 2: Pet. Supporting Facts: Collateral Appeal Proceedings at 17-18.)  Specifically, he argues that "[i]t is clear that arguments concerning the legall[]y insufficient evidence claims were [factually] made [off-the-record] . . . [but] Justice Fisch made no effort to place back [on-the-record] counsel[']s
(continued...)

mentioned the specific argument raised on appeal, namely, that the State failed to "establish beyond a reasonable doubt that at the time of the incident [Lisojo] harbored the mental state of depraved indifference, a key element of the crime," nor did counsel object to the elements of the offense as they were charged to the jury.  (Dkt. No. 5: Ex. 4: Lisojo Ct. of Appeals Br. at 13; <u>see also</u> pages 26-28 above.)[19]

---

[18]     (...continued)
arguments."  (Pet. Supporting Facts: Collateral Appeal Proceedings at 18.)  Here, defense counsel was given an opportunity to make his argument on the record  and, unlike the case in <u>Fernandez</u> – where the record was ambiguous as to what was said off the record – Lisojo's counsel's objection was  was made clear by:  (1) counsel's own on-the-record statements following the conference (<u>see</u> paged 19-20 above); (2) Justice Fisch's subsequent ruling on defense counsel's objections (<u>see</u> page 20 above); and (3) subsequent statements made in regard to the off-the-record objection (<u>see</u> page 24 above & page 47 n.19 below).

[19]     Lisojo makes much of Justice Fisch's decision regarding defense counsel's pre-charge conference objection wherein Justice Fisch ruled:

> Yesterday during our charge conference [defense counsel] had requested that I charge as a lesser included of manslaughter in the second degree as reckless, and I have reviewed that and I think this morning alternatively he asked for a manslaughter in the first degree.
>
> I reviewed the evidence.  There is no reasonable view of the evidence that would support either charge so that motion is denied.
>
> The brutality of the crime, the number of the stab wounds, location of the stab wounds, the force with which they were inflicted, testimony of the doctor that the victim was actually, was bound when stabbed fatally plus the other evidence in the case leads me to find that no reasonable view of the evidence would support those charges.

(<u>See</u> page 20 above.)  According to Lisojo, "the [court]'s comments . . . demonstrate that in denying [his] application[,] the court had specifically confronted and resolved in the People's
(continued...)

New York case law makes clear that such a boilerplate motion, without explanation, is not sufficient to preserve a challenge to the sufficiency of the evidence.  See, e.g., People v. Hawkins, 11 N.Y.3d at 493, 872 N.Y.S.2d at 400 (Trial counsel's motion for dismissal on the grounds that the state "failed to prove that [defendant] acted with Depraved Indifference Murder" was not specific enough to preserve the legal insufficiency issue for review because it "did little more than argue that the People failed to prove the essential elements of depraved indifference murder. The objection could have been directed at either the reckless mens rea element, or the objective circumstances . . . ."); People v. Taylor,  62 A.D.3d 605, 608, 882 N.Y.S.2d 1, 4 (1st Dep't 2009) (Sufficiency challenge unpreserved where "defendant's argument at trial was confined to calling into question the time frame with respect to the conduct constituting depraved indifference murder," and not the position taken on appeal, "that the evidence did not establish the 'brutal, prolonged and ultimately fatal course of conduct' required."); People v. Mora,  57 A.D.3d 571, 573, 868 N.Y.S.2d 722, 724 (2d Dep't 2008) ("The defendant's generalized motion to dismiss made at the conclusion of the People's case was insufficient to preserve her challenge to the legal sufficiency of the

---

[19]/    (...continued)
favor whether sufficient evidence of [Lisojo]'s depravity had been elicited."  (Lisojo Ct. of Appeals Br. at  17.)  To the contrary, it is evident that in denying the application, Justice Fisch rejected Lisojo's claim that there was a reasonable view of the evidence supporting a charge of second degree manslaughter, and nothing more.  That Justice Fisch understood counsel's application as one regarding the availability of second degree manslaughter as a lesser included offense is made certain by counsel's later statement that he had no objections to the charge as given "other than previously noted about my lesser included charge."  (See page 24 above.)

evidence" of depraved indifference murder.); People v. Wells, 53 A.D.3d 181, 188-89, 862 N.Y.S.2d 20, 25 (1st Dep't 2008) (Defendant's objection "did not suffice to apprise the trial court of the contention . . . advanced [on appeal] that depraved indifference must be evaluated subjectively from [defendant's] mental state and not objectively from the surrounding circumstances" where "Defendant never objected that the trial court was required to find that he acted with a mental state beyond recklessness or that depraved indifference referred to anything other than the circumstances under which the risk-creating conduct took place."); People v. Bowman,  48 A.D.3d 178, 182-83, 847 N.Y.S.2d 536, 540 (1st Dep't 2007) (Defendant's claim that "the evidence fail[ed] to establish the required culpable mental state" was unpreserved for appellate review because he "neither raised that contention in moving to dismiss nor voiced any objection to the court's charge to the jury on the elements of the crime.").[20]

---

[20]    See also, e.g., People v. Danielson, 40 A.D.3d 174, 176, 832 N.Y.S.2d 546, 548 (1st Dep't 2007) ("[D]efendant's legal sufficiency claim is unpreserved . . . [because] [t]here was no mention of the argument he now raises on appeal, namely, that the trial evidence supported only a theory of intentional murder, not a reckless one committed under circumstances evincing a depraved indifference to human life.  Because defendant's dismissal motion was not specifically directed at the alleged insufficiency that he now raises on appeal, the claim is unpreserved as a matter of law, and we decline to review it in the interests of justice.") (citations omitted); People v. Craft, 36 A.D.3d 1145, 1146, 827 N.Y.S.2d 376, 377 (3d Dep't 2007) (Legal sufficiency issue had "'not been properly preserved for judicial review because [defendant] failed to seek dismissal at the conclusion of the People's case or at the end of the trial by making a detailed, specific motion addressed to the claimed deficiencies in the evidence.'"); People v. Hall, 32 A.D.3d 864, 864, 820 N.Y.S.2d 526, 526 (2d Dep't 2006) ("The defendant's claim that the evidence was insufficient to establish his guilt of depraved indifference murder was not preserved for appellate review as the defendant's motion to dismiss was not 'specifically directed' to the depraved indifference charge.") (citations omitted); People v. Flores, 23 A.D.3d 194, 195, 803 N.Y.S.2d 85, 86 (1st Dep't 2005) (legal (continued...)

It is well settled that failure to object at trial when required by New York's contemporaneous objection rule, C.P.L. § 470.05, is an adequate and independent bar to federal habeas review. See, e.g., Wainwright v. Sykes, 433 U.S. 72, 86, 90, 97 S. Ct. 2497, 2506-08 (1977) (contemporaneous objection rule is an adequate and independent state ground); Murray v. Carrier, 477 U.S. 478, 485-92, 497, 106 S. Ct. 2639, 2644-48, 2650 (1986) (same); Brown v. Ercole, No. 09-1683, 2009 WL 3806398 at *1 (2d Cir. Nov. 16, 2009) ("[A]pplication of New York's contemporaneous objection rule may bar federal habeas review."); Garvey v. Duncan 485 F.3d 709, 720 (2d Cir. 2007) (Petitioner's claim "was not raised either by specific objection or by the trial court's decision.  As a consequence, . . . [w]e need not reach or decide the defendant's federal claims, since there was an independent and adequate state law ground for the state appellate court's decision to affirm the defendant's conviction.");  Richardson v. Greene, 497 F.3d 212, 219 (2d Cir. 2007) ("[I]n accordance with New York case law, application of the state's preservation rule is adequate – i.e., firmly established and regularly followed."); Franco v. Walsh, 73 Fed. Appx. 517, 518 (2d Cir. 2003) (finding petitioner's claim of an erroneous jury charge procedurally defaulted because "[n]o

---

[20/]   (...continued)
sufficiency issue not preserved where, "[i]n his motion for a trial order of dismissal, defense counsel stated:  'I ask for a trial order of dismissal, that the People have not proved that defendant acted under circumstances evincing a depraved indifference to human life.'  Thus, defendant did not alert the court to the instant argument, that his conduct was intentional, not reckless.") (citations omitted), appeal denied, 6 N.Y.3d 775, 811 N.Y.S.2d 343 (2006); People v. Morrison, 17 A.D.3d 272, 272, 795 N.Y.S.2d 2, 3 (1st Dep't 2005) ("Neither defendant's generalized motion to dismiss, nor his motion to set aside the verdict preserved his argument that his conduct clearly constituted intentional murder and thus failed to support his conviction of depraved indifference assault . . . .") (citations omitted).

contemporaneous objection to the charge was lodged, and the Appellate Division found that the issue was therefore unpreserved."); <u>Garcia</u> v. <u>Lewis</u>, 188 F.3d 71, 79 (2d Cir. 1999) ("we have observed and deferred to New York's consistent application of its contemporaneous objection rules") (citing <u>Bossett</u> v. <u>Walker</u>, 41 F.3d 825, 829 n.2 (2d Cir. 1994) (respecting state court's application of C.P.L. § 470.05(2) as adequate bar to federal habeas review), <u>cert. denied</u>, 514 U.S. 1054, 115 S. Ct. 1436 (1995), & <u>Fernandez</u> v. <u>Leonardo</u>, 931 F.2d 214, 216 (2d Cir.) (noting that failure to object at trial constitutes adequate procedural default under C.P.L. § 470.05(2)), <u>cert. denied</u>, 502 U.S. 883, 112 S. Ct. 236 (1991)).[21/]

More specifically, district court decisions within the Circuit have upheld as an adequate and independent state ground New York's rule that general motions to dismiss that do not set forth the specific grounds for the alleged insufficiency of the evidence fail to preserve the issue. <u>See</u>, <u>e.g.</u>, <u>Farino</u> v. <u>Ercole</u>, No 07 CV 3592, 2009 WL 3232693 at *7, 9 (E.D.N.Y. Sept. 30, 2009) (Trial counsel's motion for dismissal of depraved indifference murder charge on the grounds that the evidence "was insufficient . . . to sustain the charges in the indictment" did not preserve a legal

---

[21/]     <u>See also</u>, <u>e.g.</u>, <u>Glenn</u> v. <u>Bartlett</u>, 98 F.3d at 724-25 (failure to object constituted adequate and independent state ground); <u>Velasquez</u> v. <u>Leonardo</u>, 898 F.2d at 9 (violation of New York's contemporaneous objection rule is an adequate and independent state ground); <u>Figueroa</u> v. <u>Greiner</u>, 02 Civ. 2126, 2002 WL 31356512 at *11-12 (S.D.N.Y. Oct. 18, 2002) (Peck, M.J.) ("The Second Circuit has held that the failure to object at trial when required by New York's contemporaneous objection rule, C.P.L. § 470.05, is an adequate and independent state ground."); <u>Jamison</u> v. <u>Smith</u>, No. 94 CV 3747, 1995 WL 468279 at *2 (E.D.N.Y. July 26, 1995) ("Courts in this circuit have consistently held that the failure to object contemporaneously . . . constitutes an adequate and independent basis for barring <u>habeas</u> review.").

sufficiency issue because "counsel's objection was not specifically directed to the sufficiency of the evidence with respect to depraved indifference murder."); Flores v. Rivera, 06 Civ. 13417, 2009 WL 1110578 at *1, 7 (S.D.N.Y. Apr. 23, 2009) (Trial counsel's motion to dismiss depraved indifference murder charge on the grounds that "'the People have not proved that the defendant acted under circumstances evincing a depraved indifference to human life'" did not preserve legal sufficiency issue because it "'did not alert the [trial] court to the [argument on appeal] that his conduct was intentional, not reckless.'"); Fore v. Ercole, 594 F. Supp. 2d 281, 289 (E.D.N.Y. 2009) (Motion for dismissal "on the ground that the People had not made out a prima facie case with respect to the counts in the indictment" did not preserve a legal sufficiency issue because a "a general motion to dismiss is not sufficient to preserve the contention that the evidence at trial was insufficient to establish a specific element of the crime charged."); Brito v. Phillips, 485 F. Supp. 2d 357, 363 (S.D.N.Y. 2007) ("New York courts have consistently held that a general motion to dismiss does not preserve a challenge to the legal sufficiency of the evidence of depraved indifference.") (citing N.Y. cases).[22/]

---

[22/]    See also, e.g., Weathers v. Conway, No. 05 CV 139, 2007 WL 2344858 at *8 (W.D.N.Y. Aug. 15, 2007) ("Under case law applying New York's contemporaneous objection rule, this generalized motion [to dismiss on grounds that prosecution "haven't met their burden"] was not sufficient to preserve a specific objection to the legal sufficiency of evidence of a robbery."); Brown v. People, No. 04 CV 1087, 2006 WL 3085704 at *3 (E.D.N.Y. Oct. 30, 2006) (general motion to dismiss that "did not specifically mention the sufficiency of the evidence regarding forcible compulsion . . . was 'unpreserved for appellate review.'" Such a procedural default "constitutes an independent and adequate state ground."); Pretlow v. Lord, No. 03 CV 2547, 2005 WL 1073609 at *2 (E.D.N.Y. Apr. 29, 2005) ("New York courts have required that a motion to dismiss for insufficient evidence be specifically (continued...)

Accordingly, the state court's denial of Lisojo's claim that the evidence adduced at trial was insufficient to sustain his conviction for depraved indifference murder rests on an adequate and independent state procedural bar.

### B.    Cause and Prejudice

Because there is an adequate and independent finding by the state courts that Lisojo procedurally defaulted on his challenge to the sufficiency of the evidence, Lisojo would have to show in his habeas petition "'cause' for the default and 'prejudice attributable thereto,' or demonstrate that failure to consider the federal claim will result in a 'fundamental miscarriage of justice,'" i.e., a showing of "actual innocence." Harris v. Reed, 489 U.S. 255, 262, 109 S. Ct. 1038, 1043 (1989) (citations omitted); accord, e.g., Coleman v. Thompson, 501 U.S. 722, 750, 111 S. Ct. 2546, 2565 (1991).[23/]

---

[22/]    (...continued)
directed at the alleged error.  At the conclusion of the People's case against [petitioner], Defense Counsel moved to dismiss all of the charges on the general grounds that the People had failed to establish each and every element of the charges. . . .[T]his Court finds that the Appellate Division's finding of procedural default is an independent and adequate state ground for barring this claim in federal court.") (citations & quotations omitted); Besser v. Walsh, 02 Civ. 6775, 2003 WL 22093477 at *21 (S.D.N.Y. Sept. 10, 2003) (Peck, M.J.) ("'It is black letter law in New York that a defendant's trial motion to dismiss for insufficiency of the evidence must be "specifically directed" at the alleged error to be preserved for appellate review.'"  State court's denial of claim thus rests on adequate and independent state law grounds.) (quoting Ibarra v. Burge, 02 Civ. 0825, 2002 WL 11467756 at *3 (S.D.N.Y. July 9, 2002) (Peck, M.J.)), report & rec. adopted, 2003 WL 22846044 (S.D.N.Y. Dec. 2, 2003).

[23/]    See also, e.g., Acosta v. Artuz, 575 F.3d 177, 184 (2d Cir. 2009); King v. Artuz, 259 Fed. Appx. 346, 347 (2d Cir. 2008); Messiah v. Duncan, 435 F.3d 186, 195 (2d Cir. 2006); Green (continued...)

Lisojo asserts that there is cause for counsel's default because, given the state of the law at the time of his conviction, any objection to the legal sufficiency would have been futile and "perfect compliance with the state[']s rule would [not] have changed [the] court's decision." (Dkt. No. 14: Lisojo Reply Br. at 35.)

Although a handful of district court decisions within this Circuit had found this argument persuasive,[24] the Second Circuit recently addressed and rejected this very claim. Brown v. Ercole, No. 08-4946-CV, 2009 WL 3806398 (2d Cir. Nov. 16, 2009); see also DiSimone v. Phillips, 461 F.3d 181, 185, 191 (2d Cir. 2006). In Brown, the petitioner was charged with both intentional and depraved indifference murder for chasing and beating a young man, before fatally stabbing him with a folding knife. Brown v. Ercole, 07 Civ. 11609, 2009 WL 857625 at *1-2 (S.D.N.Y. Mar. 31, 2009). In November 2003, at the close of the prosecution's case, and again at the close of evidence, Brown moved for a trial order of dismissal on the grounds that the State had

---

[23] (...continued)
v. Travis, 414 F.3d 288, 294 (2d Cir. 2005); Smith v. Duncan, 411 F.3d 340, 347 (2d Cir. 2005); DeBerry v. Portuondo, 403 F.3d 57, 64 (2d Cir.), cert. denied, 546 U.S. 884, 126 S. Ct. 225 (2005); St. Helen v. Senkowski, 374 F.3d at 183-84; DiGuglielmo v. Smith, 366 F.3d at 135; Jones v. Vacco, 126 F.3d 408, 415 (2d Cir. 1997); Glenn v. Bartlett, 98 F.3d at 724; Velasquez v. Leonardo, 898 F.2d at 9.

[24] See, e.g., Fernandez v. Smith, 558 F. Supp. 2d 480, 493-94 (S.D.N.Y. 2008) ("The evolvement of the [depraved indifference murder] law is surely an 'objective factor external to the defense' that trial counsel could not reasonably have foreseen at the time of trial"); Flores v. Rivera, 06 Civ. 13517, 2009 WL 1110578 at *14 (S.D.N.Y. Apr. 23, 2009) ("Because New York's depraved indifference murder law changed while the case was on direct appeal, . . . it would have been futile for counsel to raise this specific objection at trial."), report & rec. rejected on this ground, 2009 WL 1110578 at *7.

failed to "'prove the defendant's guilt beyond a reasonable doubt.'" Brown v. Ercole, 2009 WL 857625 at *2.  Like Lisojo, Brown was acquitted of intentional murder but convicted of depraved indifference murder.  Brown v. Ercole, 2009 WL 857625 at *3.  On direct appeal, Brown challenged the legal sufficiency of the evidence.  Brown v. Ercole, 2009 WL 857625 at *3.  As in Lisojo's case, the First Department determined that Brown's "general motion for an order of dismissal was insufficient to satisfy New York's contemporaneous objection rule," and was thus "'unpreserved for [their] review.'"  See Brown v. Ercole, 2009 WL 857625 at *4.  In his federal habeas petition, Brown argued that "because of the state of the law at the time of trial, it would have been futile for trial counsel to challenge the legal sufficiency of the evidence presented by the People in support of the depraved indifference murder charge."  Brown v. Ercole, 2009 WL 857625 at *6.  Finding that "petitioner cannot reasonably be penalized for his trial counsel's failure to anticipate a marked sea change by the [N.Y.] Court of Appeals with regard to the definition of depraved indifference murder," the district court found cause for Brown's procedural default and granted his petition on the merits.  Brown v. Ercole, 2009 WL 857625 at *6, 8.  In reversing, the Second Circuit ruled that "futility cannot constitute cause for procedural default 'it if means simply that a claim was unacceptable to that particular court at that particular time.'"  Brown v. Ercole, 2009 WL 3806398 at *1 (quoting Bousley v. United States, 523 U.S. 614, 623, 118 S. Ct. 1609, 1611 (1998)).[25/]  Moreover, the Second Circuit ruled, "'New York state courts had not consistently rejected' the claim

---

[25/]    See also, e.g., Jones v. Keane, 329 F.3d 290, 295 (2d Cir. 2003) ("It is well established that a petitioner may not bypass state courts merely because they may be unreceptive to the claim.").

that a conviction for depraved indifference murder was unsupported by the evidence," and had in fact reversed several "depraved indifference murder convictions on the grounds that the evidence was legally insufficient."  <u>Brown</u> v. <u>Ercole</u>, 2009 WL 3806398 at *1.  Accordingly, Brown could not "prevail on his claim that it would have been futile for him to argue at trial that the evidence adduced was insufficient to support a conviction."  <u>Brown</u> v. <u>Ercole</u>, 2009 WL 3806398 at *2.

   This Court must follow he Second Circuit's decision in <u>Brown</u>.  The facts presented here are indistinguishable from those in <u>Brown</u> and, accordingly, Lisojo's claim – that it would have been futile for trial counsel to object that the evidence was insufficient to support a conviction for depraved indifference murder – does not constitute cause for his procedural default.  Because Lisojo has not shown cause for the procedural default, the Court need not consider whether he suffered prejudice.  <u>E.g.</u>, <u>Brown</u> v. <u>Ercole</u>,  2009 WL 3806398  at *2.[26]

   Lisojo's also invokes the "fundamental miscarriage of justice" exception, arguing that he is "actually innocent" of depraved indifference murder.  (Lisojo Reply Br. at 45-46.)  The Supreme Court has explained that the fundamental miscarriage of justice exception is "tied . . . to [a] petitioner's innocence" and exists to protect those who are "actually innocent."  <u>Schlup</u> v. <u>Delo</u>, 513 U.S. 298, 321, 324, 115 S.Ct. 851, 864, 865 (1995).  Because "'actual innocence' means factual

---

[26]  See also, e.g., <u>Stepney</u> v. <u>Lopes</u>  760 F.2d 40, 45 (2d Cir. 1985) ("Since a petitioner who has procedurally defaulted in state court must show both cause and prejudice in order to obtain federal habeas review, we need not, in light of our conclusion that there was no showing of cause, reach the question of whether or not Stepney showed prejudice."); <u>Bonilla</u> v. <u>Burge</u>, 06 Civ. 4755, 2009 WL 4884092 at *10 (S.D.N.Y. Dec. 17, 2009); <u>Galusha</u> v. <u>Duncan</u>, No. 02 CV 1602, 2007 WL 4198272 at *14 (N.D.N.Y. Nov. 21, 2007); <u>D'Alessandro</u> v. <u>Fischer</u>, 01 Civ. 2551, 2005 WL 3159674 at *9 n.10 (S.D.N.Y. Nov. 28, 2005).

innocence, not mere legal insufficiency," Bousley v. United States, 523 U.S. at 623-24, 118 S.Ct.

at 1611; accord, e.g., Sweet v. Bennett  353 F.3d 135, 142 (2d Cir. 2003); Dunham v. Travis, 313

F.3d 724, 730 (2d Cir. 2002), "prisoners asserting innocence as a gateway to defaulted claims must

establish that, in light of new evidence, 'it is more likely than not that no reasonable juror would have

found petitioner guilty beyond a reasonable doubt.'" House v. Bell, 547 U.S. 518, 536-37, 126 S.Ct.

2064, 2076-77 (2006) (emphasis added); see also, e.g., Schlup v. Delo, 513 U.S. at 324-27, 115 S.

Ct. at 865-67 (fundamental miscarriage of justice must  be demonstrated by showing through "new

reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts,

or critical physical evidence – that was not presented at trial," that "it is more likely than not that no

reasonable juror would have convicted him in light of the new evidence."); Murden v. Artuz, 497

F.3d 178, 194 (2d Cir. 2007) ("'To demonstrate actual innocence a habeas petitioner must show that

it is more likely than not that no reasonable juror would have convicted him in light of the new

evidence.'  This requires 'a stronger showing' than the showing of prejudice necessary to prevail on

an ineffective assistance claim.   Actual innocence requires 'not legal innocence but factual

innocence.'") (citations omitted).  Accordingly, the fundamental miscarriage of justice exception is

"extremely rare" and should be applied only in "extraordinary case[s]." Schlup v. Delo, 513 U.S.

at 321-22, 115 S.Ct. at 865; see also, e.g., Morrison v. Ercole, 07 Civ. 3576,  2009 WL 161040 at

*6 (S.D.N.Y. Jan. 16, 2009) ("The Second Circuit has emphasized that the type of evidence on which

claims of actual innocence may be based is strictly limited and that petitioners must meet a

'demanding standard' in order to take advantage of this 'gateway.'").

Lisojo utterly fails to meet the heavy burden required by Schlup and House.  First, Lisojo does not claim to be entirely innocent; he concedes that the evidence "proved that he was guilty of manslaughter" (Lisojo Reply Br. at 46), but argues it was insufficient to convict him of depraved indifference murder.  See, e.g., King v. Artus  259 Fed. Appx. at 347 (Where petitioner asserted that the evidence demonstrated he was guilty of intentional murder, but not depraved indifference murder, "[t]he miscarriage-of-justice exception does not apply because this is patently not a case in which 'a constitutional violation has probably resulted in the conviction of one who is actually innocent.'"); Garbut v. Conway, 05 Civ. 9898, 2009 WL 2474099 at *2-3 (S.D.N.Y. Aug. 12, 2009) (petitioner failed to overcome the procedural bar because he made no "claim that he is entirely innocent."); Galusha v. Duncan, 2007 WL 4198272 at *14 (denying to review procedurally barred legal sufficiency claim under the fundamental miscarriage of justice claim because, given evidence that petitioner had strangled his victim and "went to great lengths to cover up the crime[,] . . . [t]here c[ould] be no claim of actual innocence").[27]

Thus, Lisojo's claim amounts to nothing more than a legal sufficiency argument that is insufficient to invoke the fundamental miscarriage of justice exception.  Moreover, Lisojo does not provide any new evidence or support for his conclusory assertion of innocence.  (See Lisojo Reply Br. at 45.)  Accordingly, Lisojo has failed to make a "'colorable showing of factual innocence'

---

[27]  But see Fernandez v. Smith, 558 F. Supp. 2d at 494 (finding fundamental miscarriage of justice exception applied even where the "evidence surely proved that [petitioner] was guilty of manslaughter" because his actions "did not constitute depraved indifference murder as a matter of law, and it would be manifestly unjust for him to serve a sentence for a crime that he did not commit.").

in the form of newly adduced evidence." Burgos-Santos v. Greene, 05 Civ. 3763, 2009 WL 1916381 at *2 (S.D.N.Y. July 1, 2009); see also cases cited on pages 56-57 above.

Finally, given the uncommon brutality of Lisojo's crime, the fact that Lisojo left his victim bound and bleeding on the floor of her apartment and most importantly, his videotaped statement that he did not intend to kill Figueroa but was merely trying to restrain her, the Court cannot conclude that no reasonable juror could have convicted him of depraved indifference murder, even under the new standard articulated in People v. Feingold, 7 N.Y.3d 288, 819 N.Y.S.2d 691 (2006). See, e.g., Gaskin v. Graham, No. 08-CV-1124, 2009 WL 5214498 at *2, 11-14 (E.D.N.Y. Dec. 30, 2009) (concluding that a rational fact finder could have found petitioner guilty of depraved indifference murder where trial counsel argued that defendant "did not intend to kill" the victim, even though the evidence showed that petitioner pointed a gun at the victim's head and fired); Fore v. Ercole, 594 F. Supp. 2d 281, 304 (E.D.N.Y. 2009) (concluding that a rational factfinder could have convicted petitioner of depraved indifference murder, even under the new standard, where evidence showed that he pointed a gun through a car window, closed his eyes, and fired multiple rounds into the victim).

This is hardly the extraordinary case where "the principles of comity and finality that inform the concepts of cause and prejudice 'must yield to the imperative of correcting a fundamentally unjust incarceration.'" Murray v. Carrier, 477 U.S. 478, 495, 106 S. Ct. 2639, 2649 (1986). Because Lisojo has not demonstrated that a failure to consider the claim will result in a fundamental miscarriage of justice, the Court finds no basis to invoke this "extremely rare" exception to a procedural bar.

Lisojo has not shown cause, prejudice, or a fundamental miscarriage of justice. Accordingly his habeas claim regarding the sufficiency of the evidence should be <u>DENIED</u> as procedurally barred by adequate and independent state law grounds.

**III.   LISOJO'S HABEAS CLAIM THAT THE TRIAL COURT FAILED TO CHARGE A LESSER INCLUDED OFFENSE DOES NOT STATE A FEDERAL CONSTITUTIONAL CLAIM**

Lisojo claims that the trial court erred by not instructing the jury on second-degree reckless manslaughter as a lesser included offense of second degree assault, thereby "depriv[ing] [him] of [his]due process right to a fair trial and equal protection of the law." (Dkt. No. 2: Pet. ¶ 13(2).)

There is a constitutional right to a lesser included offense charge in capital cases. <u>Beck</u> v. <u>Alabama</u>, 447 U.S. 625, 638, 100 S. Ct. 2382, 2390 (1980).  The Supreme Court in <u>Beck</u>, however, left open "whether the Due Process Clause would require the giving of such instructions in a noncapital case." <u>Id</u>. at 638 n.14, 100 S. Ct. at 2390 n.14.  The Second Circuit thus has held habeas relief unavailable for a failure to charge a lesser included offense in non-capital cases. <u>E.g.</u>, <u>Jones</u> v. <u>Hoffman</u>, 86 F.3d 46, 48 (2d Cir. 1996) ("Since a decision interpreting the Constitution to require the submission of instructions on lesser-included offenses in non-capital cases would involve the announcement of a new rule, we hold that <u>Teague</u> [v. <u>Lane</u>, 489 U.S. 288, 109 S. Ct. 1060 (1989)] precludes our consideration of the issue" in habeas cases.); <u>accord</u>, <u>e.g.</u>, <u>Rasmussen</u> v. <u>Kupec</u>, 54 Fed. Appx. 518, 519 (2d Cir. 2003) ("Both the Supreme Court and our court have expressly refrained from deciding whether the Constitution requires lesser-included-offense

instructions in non-capital cases.  [citing <u>Beck</u> and <u>Jones</u>.]  <u>Teague</u> v. <u>Lane</u>, however, bars us from announcing new rules of constitutional interpretation in habeas corpus cases."); <u>Powell</u> v. <u>Phillips</u>, 05 Civ. 3537, 2009 WL 929538 at *14 (S.D.N.Y. Apr. 7, 2009) (The Second Circuit has declined "in the habeas context, to rule on whether a defendant has a due-process right to a lesser-included-offense charge in non-capital cases."); <u>Durden</u> v. <u>Greene</u>, 492 F. Supp. 2d 414, 423 (S.D.N.Y. 2007) ("Given the determinations of [the <u>Beck</u> and <u>Jones</u>] courts not to rule on the issue, it cannot be said that there is a 'clearly established' right under federal law to the submission of lesser included offenses in non-capital cases.") (citing additional district court decisions); <u>Bulla</u> v. <u>Lempke</u>, 06 Civ. 1156, 2006 WL 2457945 at *11 (S.D.N.Y. Aug. 25, 2006), <u>report & rec. adopted</u>, 2007 WL 259935 (S.D.N.Y. Jan. 29, 2007).

Accordingly, Lisojo's claim that the trial court erred in failing to charge second degree manslaughter as a lesser included offense should be <u>DENIED</u>.

## IV.    LISOJO'S CLAIM OF INEFFECTIVE ASSISTANCE OF COUNSEL IS WITHOUT MERIT

### A.    The Strickland v. Washington Standard on Ineffective Assistance of Counsel

In <u>Strickland</u> v. <u>Washington</u>, 466 U.S. 668, 104 S. Ct. 2052 (1984), the Supreme Court announced a two-part test to determine if counsel's assistance was ineffective:  "First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by

the Sixth Amendment." Id. at 687, 104 S. Ct. at 2064.[28/]  This performance is to be judged by an

objective standard of reasonableness.  Strickland v. Washington, 466 U.S. at 688, 104 S. Ct. at

2064.[29/]

> Judicial scrutiny of counsel's performance must be highly deferential.  It is all too
> tempting for a defendant to second-guess counsel's assistance after conviction . . . .
> A fair assessment of attorney performance requires that every effort be made to
> eliminate the distorting effects of hindsight, to reconstruct the circumstances of
> counsel's challenged conduct, and to evaluate the conduct from counsel's perspective
> at the time . . . .  [A] court must indulge a strong presumption that counsel's conduct
> falls within the wide range of reasonable professional assistance; that is, the
> defendant must overcome the presumption that, under the circumstances, the
> challenged action "might be considered sound trial strategy."

Strickland v. Washington, 466 U.S. at 689, 104 S. Ct. at 2065 (citation omitted).[30/]

Second, the defendant must show prejudice from counsel's performance.  Strickland

v. Washington, 466 U.S. at 687, 104 S. Ct. at 2064.  The "question is whether there is a reasonable

probability that, absent the errors, the fact finder would have had a reasonable doubt respecting

guilt." Id. at 695, 104 S. Ct. at 2068-69.  Put another way, the "defendant must show that there is

---

[28/]   Accord, e.g., Wiggins v. Smith, 539 U.S. 510, 521, 123 S. Ct. 2527, 2535 (2003); Bell v. Miller, 500 F.3d 149, 156-57 (2d Cir. 2007); Henry v. Poole, 409 F.3d 48, 62-63 (2d Cir. 2005), cert. denied, 547 U.S. 1040, 126 S. Ct. 1622 (2006).

[29/]   Accord, e.g., Wiggins v. Smith, 539 U.S. at 521, 123 S. Ct. at 2535; Bell v. Cone, 535 U.S. 685, 695, 122 S. Ct. 1843, 1850 (2002); Henry v. Poole, 409 F.3d at 63.

[30/]   Accord, e.g., Bell v. Cone, 535 U.S. at 698, 122 S. Ct. at 1852; Bell v. Miller, 500 F.3d at 156-57; Henry v. Poole, 409 F.3d at 63; Aparicio v. Artuz, 269 F.3d 78, 95 (2d Cir. 2001); Sellan v. Kuhlman, 261 F.3d 303, 315 (2d Cir. 2001).

a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694, 104 S. Ct. at 2068.[31/]

The Supreme Court has counseled that these principles "do not establish mechanical rules." Strickland v. Washington, 466 U.S. at 696, 104 S. Ct. at 2069. The focus of the inquiry should be on the fundamental fairness of the trial and whether, despite the strong presumption of reliability, the result is unreliable because of a breakdown of the adversarial process. Id.

Any counsel errors must be considered in the "aggregate" rather than in isolation, as the Supreme Court has directed courts "to look at the 'totality of the evidence before the judge or

---

[31/]  See also, e.g., Wiggins v. Smith, 539 U.S. at 534, 123 S. Ct. at 2542; Bell v. Cone, 535 U.S. at 695, 122 S. Ct. at 1850; Mosby v. Senkowski, 470 F.3d 515, 519 (2d Cir. 2006), cert. denied, 128 S. Ct. 75 (2007); Henry v. Poole, 409 F.3d at 63-64; Aparicio v. Artuz, 269 F.3d at 95; Sellan v. Kuhlman, 261 F.3d at 315; DeLuca v. Lord, 77 F.3d 578, 584 (2d Cir.), cert. denied, 519 U.S. 824, 117 S. Ct. 83 (1996).

"[A] reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland v. Washington, 466 U.S. at 694, 104 S. Ct. at 2068; accord, e.g., Wiggins v. Smith, 539 U.S. at 534, 123 S. Ct. at 2542. The phrase "reasonable probability," despite its language, should not be confused with "probable" or "more likely than not." Strickler v. Greene, 527 U.S. 263, 289-91, 119 S. Ct. 1936, 1952-53 (1999); Kyles v. Whitley, 514 U.S. 419, 434, 115 S. Ct. 1555, 1565-66 (1995); Nix v. Whiteside, 475 U.S. 157, 175, 106 S. Ct. 988, 998 (1986) ("a defendant need not establish that the attorney's deficient performance more likely than not altered the outcome in order to establish prejudice under Strickland"); Strickland v. Washington, 466 U.S. at 694, 104 S. Ct. at 2068 ("The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome."). Rather, the phrase "reasonable probability" seems to describe a fairly low standard of probability, albeit somewhat more likely than a "reasonable possibility." Strickler v. Greene, 527 U.S. at 291, 119 S. Ct. at 1953; cf. id. at 297-301, 119 S. Ct. at 1955-58 (Souter, J., concurring & dissenting) (arguing that any difference between "reasonable probability" and "reasonable possibility" is "slight").

jury.'" Lindstadt v. Keane, 239 F.3d 191, 199 (2d Cir. 2001) (quoting Strickland v. Washington, 466

U.S. at 695-96, 104 S. Ct. at 2069); accord, e.g., Rodriguez v. Hoke, 928 F.2d 534, 538 (2d Cir.

1991).

       The Supreme Court also made clear that "there is no reason for a court deciding an

ineffective assistance claim . . . to address both components of the inquiry if the defendant makes

an insufficient showing on one." Strickland v. Washington, 466 U.S. at 697, 104 S. Ct. at 2069.[32]

       In addition, the Supreme Court has counseled that "strategic choices made after

thorough investigation of law and facts relevant to plausible options are virtually unchallengeable;

and strategic choices made after less than complete investigation are reasonable precisely to the

extent that reasonable professional judgments support the limitations on investigation. . . .  In any

ineffectiveness case, a particular decision not to investigate must be directly assessed for

reasonableness in all the circumstances, applying a heavy measure of deference to counsel's

judgments." Strickland v. Washington, 466 U.S. at 690-91, 104 S. Ct. at 2066.[33]

---

[32]    Accord, e.g., Smith v. Robbins, 528 U.S. 259, 286 n.14, 120 S. Ct. 746, 764 n.14 (2000).

[33]    See also, e.g., Yarborough v. Gentry, 540 U.S. 1, 5-6, 124 S. Ct. 1, 4 (2003); Engle v. Isaac, 456 U.S. 107, 134, 102 S. Ct. 1558, 1575 (1982) ("We have long recognized . . . that the Constitution guarantees criminal defendants only a fair trial and a competent attorney. It does not insure that defense counsel will recognize and raise every conceivable constitutional claim."); Jackson v. Leonardo, 162 F.3d 81, 85 (2d Cir. 1998) ("In reviewing Strickland claims, courts are instructed to 'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance' and that counsel's conduct was not the result of error but derived instead from trial strategy. We are also instructed, when reviewing decisions by counsel, not to 'second-guess reasonable professional judgments and impose on . . . counsel a duty to raise every "colorable" claim' on appeal.") (citations
(continued...)

As the Second Circuit noted:  "The <u>Strickland</u> standard is rigorous, and the great majority of habeas petitions that allege constitutionally ineffective counsel founder on that standard." <u>Lindstadt</u> v. <u>Keane</u>, 239 F.3d at 199; <u>accord</u>, <u>e.g.</u>, <u>Bell</u> v. <u>Miller</u>, 500 F.3d at 156-57.

### 1.    **Strickland and the AEDPA Review Standard**

For purposes of this Court's AEDPA analysis, "the <u>Strickland</u> standard . . . is the relevant 'clearly established Federal law, as determined by the Supreme Court of the United States.'" <u>Aparicio</u> v. <u>Artuz</u>, 269 F.3d 78, 95 & n.8 (2d Cir. 2001) (quoting 28 U.S.C. § 2254(d)(1)).[34]  "For AEDPA purposes, a petitioner is not required to further demonstrate that his particular theory of ineffective assistance of counsel is also 'clearly established.'" <u>Aparicio</u> v. <u>Artuz</u>, 269 F.3d at 95 n.8. "For [petitioner] to succeed, however, he must do more than show that he would have satisfied <u>Strickland</u>'s test if his claim were being analyzed in the first instance, because under § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied <u>Strickland</u> incorrectly. . . . Rather, he must show that the [First Department] applied <u>Strickland</u> to the facts of his case in an objectively unreasonable manner." <u>Bell</u> v. <u>Cone</u>, 535 U.S.

---

[33]    (...continued)
omitted); <u>Mayo</u> v. <u>Henderson</u>, 13 F.3d 528, 533 (2d Cir.) (a reviewing court "may not use hindsight to second-guess [counsel's] strategy choices"), <u>cert. denied</u>, 513 U.S. 820, 115 S. Ct. 81 (1994).

[34]    <u>See also</u>, <u>e.g.</u>, <u>Wiggins</u> v. <u>Smith</u>, 539 U.S. 510, 521-22, 123 S. Ct. 2527, 2535 (2003); <u>Bell</u> v. <u>Cone</u>, 535 U.S. 685, 698, 122 S. Ct. 1843, 1852 (2002); <u>Mosby</u> v. <u>Senkowski</u>, 470 F.3d 515, 518-19 (2d Cir. 2006), <u>cert. denied</u>, 128 S. Ct. 75 (2007); <u>Sellan</u> v. <u>Kuhlman</u>, 261 F.3d 303, 315 (2d Cir. 2001).

at 698-99, 122 S. Ct. at 1852; see also, e.g., Yarborough v. Gentry, 540 U.S. 1, 5, 124 S. Ct. 1, 4 (2003); Mosby v. Senkowski, 470 F.3d at 519.

**B.     Application of These Standards to Lisojo's Claims**

Lisojo raised the claim of ineffective assistance of trial counsel for the first time in his C.P.L. §440 motion.  (See page 28 above.)  There, Lisojo asserted that he "received ineffective assistance [of] trial counsel" because his attorney "fail[ed] to put forth his objection concerning the insufficiency of the evidence at trial to support a finding of depraved indifference with the necessary specificity required by the Criminal Procedure Law."  (See page 28 above.)

Identifying Strickland as the relevant clearly established federal law, the 440 court held that:

> In the instant matter, defense counsel made the appropriate arguments based upon the prevailing case law in existence at the time of defendant's trial.  Defense counsel can hardly be considered ineffective for failing to make an argument based upon a case which had yet to be decided and to make an argument contrary to the twenty year precedent on the issue of depraved indifference.  Defendant is entitled to effective assistance of counsel which is defined as meaningful representation, This standard does not require counsel to anticipate novel legal issues prior to their consideration by an appellate court.

(Ex. 10: Justice Fisch 4/30/08 Decision at 6.)

At the time of Lisojo's trial in 2003, the law regarding depraved indifference murder, as reflected in People v. Register, 60 N.Y.2d 270, 276, 469 N.Y.S.2d 599, 601-02 (1983), cert. denied, 466 U.S. 953, 104 S. Ct. 2159 (1984), required a showing of "'circumstances evincing a depraved indifference to human life.'"  "[T]he focus of the offense [was] not upon the subjective intent of the defendant, as it is with intentional murder, but rather upon an objective assessment of

the degree of risk presented by defendant's reckless conduct." People v. Register, 60 N.Y.2d at 277, 469 N.Y.S.2d at 602 (citations omitted).  Thus, it was the objective circumstances in which the conduct occurred that distinguished the crime of depraved indifference murder from intentional murder.  See, e.g., People v. Register, 60 N.Y.2d at 276-77, 469 N.Y.S.2d at 602.  Under Register and its progeny, it was appropriate for the trial court to let the jury decide whether defendants should be convicted of intentional or depraved indifference murder: "strong proof of intent did not foreclose the jury from finding recklessness and depraved indifference." Policano v. Herbert, 7 N.Y.3d 588, 600, 825 N.Y.S.2d 678, 687 (2006).  At the time, the Court of Appeal's reasoned that:  "'purposeful homicide itself is the ultimate manifestation of indifference to the value of human life,'" and "the very facts establishing a risk of death approaching certainty and thus presenting compelling circumstantial evidence of intent – for example, a point-blank shooting of the victim in the head – likewise demonstrated depraved indifference." Policano v. Herbert, 7 N.Y.3d at 599, 601, 825 N.Y.S.2d at 686-87.

Although later Court of Appeals decisions would chip away at, and ultimately overturn, Register on the grounds that depraved indifference describes the culpable mental state of the crime, rather than the voluntary act,[35] it was under the legal rubric of Register and its progeny

---

[35]     For a comprehensive discussion of New York's evolving interpretation of its depraved indifference murder statute, see, e.g., Fernandez v. Smith, 558 F. Supp. 2d 480, 494-98 (S.D.N.Y. 2008); Policano v. Herbert, 7 N.Y.3d 588, 825 N.Y.S.2d 678 (2006), cert. denied, 129 S. Ct. 420 (2008); People v. Suarez, 6 N.Y.3d 202, 811 N.Y.S.2d 267 (2005); People v. Payne, 3 N.Y.3d 266, 786 N.Y.S.2d 116 (2004); People v. Gonzalez, 1 N.Y.3d 464, 775 N.Y.S.2d 224 (2004); People v. Hafeez, 100 N.Y.2d 253, 762 N.Y.S.2d 572 (2003).

that Lisojo was tried and convicted, and that the Court must evaluate trial counsel's performance. See, e.g., Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir.1994) (In assessing the attorney's performance, a reviewing court must judge his conduct on the basis of the facts of the particular case, "'viewed as of the time of counsel's conduct.'")(quoting Strickland); Fore v. Ercole, 594 F. Supp. 2d 281, 305 (E.D.N.Y. 2009) ("[T]rial counsel cannot be held to be ineffective when he reasonably relied on the interpretation of New York law regarding depraved indifference murder as it was at the time of petitioner's trial."); Soto v. Conway, 565 F. Supp. 2d 429, 436 (E.D.N.Y. 2008)("[I]n reviewing counsel's performance for cause, this Court considers not what the law of New York was or is, but rather whether, in light of the case law known to him at the time, counsel's conduct fell below an objective standard of reasonableness.").

Given the state of New York's depraved indifference law at the time of Lisojo's trial, and in light of the evidence presented at trial, a motion for a trial order of dismissal was unwarranted, and counsel cannot be deemed ineffective for failing to more accurately preserve a then-meritless claim. See, e.g., Grant v. Woods, 313 Fed. Appx. 376, 377 (2d Cir. 2009) (Trial counsel was not ineffective for failing to raise a sufficiency objection because "[u]nder New York law at the time of [petitioner]'s conviction and sentencing, where both depraved indifference and intentional murder were charged 'in one-on-one shootings or knifings, these counts were submitted to the jury for it to sort out the defendant's state of mind unless there was absolutely no evidence whatsoever that the defendant might have acted unintentionally.'"); Gaskin v. Graham, No. 08 CV 1124, 2009 WL 5214498 at *23-24 (E.D.N.Y. Dec. 30, 2009) (petitioner held a gun to victim's head then fired a fatal

shot; counsel not ineffective for failure to object to the sufficiency of evidence as to depraved indifference murder because controlling law was <u>Register</u>); <u>Fore</u> v. <u>Ercole</u>, 594 F. Supp. 2d at 305 (petitioner fired multiple shots through a car window killing the victim but testified that he did not intend to kill the victim; counsel was not ineffective for failure to argue that there was no evidence that petitioner acted intentionally because the controlling law was <u>Register</u>); <u>Cruz</u> v. <u>Conway</u>, No. 05 CV 4750, 2007 WL 1651855 at *7 (E.D.N.Y. June 6, 2007) (petitioner shot victim in the back and shot him again after he fell; counsel not ineffective for failure to object to the sufficiency of evidence as to depraved indifference murder because controlling law was <u>Register</u>); <u>Crespo</u> v. <u>Fischer</u>, 06 Civ. 2577, 2006 WL 3486805 at *7-8 (S.D.N.Y. Nov. 27, 2006) (petitioner placed a plastic bag over victim's head, sealed it at the neck, covered the victim's head and face with duct tape, then kicked victim's head and remained present until victim died; appellate counsel not ineffective for failure to raise an on appeal the sufficiency of evidence as to depraved indifference because controlling law was <u>Register</u>)

Indeed, the Sixth Amendment does not require counsel to presage changes in the law. <u>See</u>, <u>e.g.</u>, <u>Jameson</u> v. <u>Coughlin</u> 22 F.3d 427, 429 (2d Cir. 1994) ("[C]ounsel [cannot] be deemed incompetent for failing to predict that the New York Court of Appeals would later overrule the Second Department's reasonable interpretation of New York law."); <u>Mayo</u> v. <u>Henderson</u>, 13 F.3d at 533 ("Counsel is not required to forecast changes in the governing law."); <u>Alexander</u> v. <u>Graham</u>, No. 07-CV-59, 2008 WL 4239167 at *7 (E.D.N.Y. Sept. 11, 2008) ("[T]rial counsel was not ineffective for . . . failing to foresee the change in New York [depraved indifference] law.").

Here, the evidence showed a brutal murder:  Using his position as a security guard to gain her trust, Lisojo gained access to Figueroa's apartment.  (See pages 6, 9, 10 & 14 above.) Once inside, Lisojo bound Figueroa's arms and legs, severely beat her and stabbed her repeatedly and fatally with a kitchen knife.  (See pages 3-6, 9-11 above.)   The close grouping of wounds on Figueroa's neck indicate that Lisojo had incapacitated her – possibly using the scarf he tied around her neck to control her movement – before delivering the forceful and fatal blows.  (See page 13 above.)  Although Lisojo  had been friendly with Figueroa for several months, he left her to bleed to death on the apartment floor.  (See pages 7-11, 13 above.)   Despite the strong circumstantial evidence demonstrating his intent to kill, Lisojo told the police and Assistant District Attorney that he merely "tried to restrain" Figueroa; although he swung the knife "like three times" at her, he did not mean "to stick" her, and Lisojo claimed that Figueroa fell onto the knife.  (Dkt. No. 13: Lisojo Supp. Reply Br. Ex. 1: V. 81-82.)  Taken together, this evidence satisfied the parameters of second degree depraved indifference murder as it was understood at the time of trial, and trial counsel was not ineffective for failing to specifically object to the legal sufficiency of the evidence.  See, e.g., People v. Sanchez, 98 N.Y.2d 373, 378, 748 N.Y.S.2d 312, 314 (2002) ("[A]ccepting the jury's determination that the killing . . . was not intentional, defendant's shooting into the victim's torso at point-blank range presented such a transcendent risk of causing his death that it readily meets the level of manifested depravity needed to establish murder under Penal Law § 125.25 (2)."), overruled by People v. Feingold, 7 N.Y.3d 288, 819 N.Y.S. 691 (2006); Policano v. Herbert, 7 N.Y.3d at 599-602, 825 N.Y.S.2d at 686-87 (The requirement that there be "[objective] circumstances evincing a

depraved indifference to human life was fulfilled if the defendant's actions created an almost certain risk of death," and "unless there was absolutely no evidence whatsoever that the defendant might have acted unintentionally," the "question of the defendant's state of mind [was] . . . a matter for the jury.").

In any event, because the § 440 court correctly identified Strickland v. Washington as the applicable federal standard governing ineffective assistance, Lisojo must show that the 440 Court "applied Strickland to the facts of his case in an objectively unreasonable manner." Bell v. Cone, 535 U.S. 685, 698-99, 122 S. Ct. 1843, 1852 (2002); see also, e.g., Yarborough v. Gentry, 540 U.S. 1, 5, 124 S. Ct. 1, 4 (2003); Mosby v. Senkowski, 470 F.3d 515, 519 (2d Cir. 2006). This Court cannot say that the § 440 court applied Strickland in an unreasonable manner.

Accordingly, Lisojo's ineffective assistance of counsel claim is without merit and should be dismissed.

## CONCLUSION

For the reasons set forth above, Lisojo's habeas petition should be DENIED in its entirety and a certificate of appealability should not be issued.[36]

## FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written

---

[36] If Lisojo requires copies of any of the cases reported only in Westlaw, he should request copies from respondent's counsel. See Lebron v. Sanders, 557 F.3d 76, 79 (2d Cir. 2009); SDNY-EDNY Local Civil Rule 7.1(c)

objections.  See also Fed. R. Civ. P. 6.  Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Colleen McMahon, 500 Pearl Street, Room 1350, and to my chambers, 500 Pearl Street, Room 1350. Any requests for an extension of time for filing objections must be directed to Judge McMahon (with a courtesy copy to my chambers).  Failure to file objections will result in a waiver of those objections for purposes of appeal.  Thomas v. Arn, 474 U.S. 140, 106 S. Ct. 466 (1985); IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1054 (2d Cir. 1993), cert. denied, 513 U.S. 822, 115 S. Ct. 86 (1994); Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993); Frank v. Johnson, 968 F.2d 298, 300 (2d Cir.), cert. denied, 506 U.S. 1038, 113 S. Ct. 825 (1992); Small v. Sec'y of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989); Wesolek v. Canadair Ltd., 838 F.2d 55, 57-59 (2d Cir. 1988); McCarthy v. Manson, 714 F.2d 234, 237-38 (2d Cir. 1983); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

Dated:       New York, New York
             March 31, 2010

                                          Respectfully submitted,


                                          _____
                                          Andrew J. Peck
                                          United States Magistrate Judge

Copies to:   Rene Lisojo
             Allen H. Saperstein, Esq.
             Judge Colleen McMahon


H:\OPIN\LISOJO